**Carlotta JONES, Plaintiff,**

v.

**Kenneth S. APFEL,[1] Commissioner of Social Security Administration.**

**No. 1:97–CV–162.**

United States District Court, N.D. Indiana, Fort Wayne Division.

Dec. 17, 1997.

---

**1.** Kenneth S. Apfel was sworn in as Commissioner of Social Security on September 29, 1997. Pursuant to Fed.R.Civ.P. 25(d)(1) and 42 U.S.C. 405(g), Kenneth S. Apfel is substituted for former Acting Commissioner John J. Callahan as the defendant in this suit.

Joseph W. Shull, Fort Wayne, IN, for Carlotta Jones, plaintiff.

Deborah M. Leonard, Fort Wayne, IN, for Social Security Administration, defendant.

## MEMORANDUM OF DECISION AND ORDER

COSBEY, United States Magistrate Judge.

## I. INTRODUCTION

This matter comes before the Court[2] pursuant to a complaint filed by the Plaintiff, Carlotta Jones ("Jones"), on May 2, 1997. Jones seeks judicial review under 42 U.S.C. § 405(g) of the decision of the Defendant, Kenneth S. Apfel, Commissioner of Social Security ("the Commissioner"), denying Jones's application for supplemental security income ("SSI"). Jones filed her opening brief on September 18, 1997, the Commissioner responded on December 3, 1997, Jones replied on December 15, 1997, and the appeal is ripe for review. For the reasons stated hereinafter, the final decision of the Commissioner denying Jones SSI benefits is REVERSED, and the cause is REMANDED for further development of the record.

## II. FACTUAL AND PROCEDURAL HISTORY

On December 8, 1993, Jones applied for SSI benefits (with a protective filing date of November 5, 1993), claiming an onset date of disability of January 1, 1991. (Record at 34–38.) Her application was denied initially (*id.* at 39–40), and upon reconsideration. (*Id.* at 43–44.) Pursuant to Jones's request, a hearing before an Administrative Law Judge ("ALJ") was held on May 31, 1995. (*Id.* at 308–341.) The ALJ denied benefits on May 13, 1996, (*id.* at 21), and Jones requested a review of that ruling. (*Id.* 302–307.) The

---

**2.** Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting.

Appeals Council denied review (*id.* at 5–6), and as a result, the ALJ's opinion stands as the Commissioner's final decision. *Luna v. Shalala,* 22 F.3d 687, 689 (7th Cir.1994); 20 C.F.R. § 404.981.

Jones has very little work experience. In the past seven years, she has worked for only a few months in jobs classified as a saw operator and salvage worker by a Vocational Expert ("VE") during the ALJ hearing. (*Id.* at 246.) She also worked for less than a month for a shoe repair business in conjunction with a Vocational Rehabilitation program. (*Id.* at 226, 315–18.)

Jones' medical history reveals a long history of drug and alcohol abuse. Jones related to many of her treating counselors and doctors that she has used marijuana, alcohol, cocaine, acid, heroin, and speed in varying degrees since she was 14 years old. (*See, e.g., id.* at 124.) At the time of the ALJ hearing Jones continued to smoke significant quantities of marijuana on a daily basis. (*Id.* at 323.) ("Q: How much do you smoke? A: As much as I can. Three or four joints a day.") We shall return to the issue of Jones' continuing use of drugs *infra.*

Jones' allegations of disability are based upon her psychological impairments, which are of long duration and for which she has received treatment on a consistent basis since 1989. Jones first sought counseling for her alleged mental disabilities from Kristine Haworth Connerly ("Connerly"), at Family and Children's Services, Inc., from 1989 through 1991. (*Id.* at 208.) At that time, Connerly's diagnosis was Adjustment Disorder with Depressed Mood. (*Id.*) Connerly reported that during these years time she saw little change in the emotional state of Jones, who ceased coming to therapy near the end of 1991. (*Id.*)

During the same time period Jones was undergoing alcohol counseling at Park Cen-

ter's Drug and Alcohol Department ("Park Center"). (*Id.* at 145.) During this period of counseling she was referred for a psychological evaluation to assess her intellectual and emotional functioning due to her numerous failures to attend counseling sessions and her apparent high risk for non-compliance with the treatment plan. (*Id.*) She was found to be in the Borderline range of intelligence.[3] (*Id.* at 46.) Other test results indicated Jones had limited learned arithmetic skills, difficulty with numerical reasoning acuity, and a reading level equivalent to the beginning of seventh grade. (*Id.*) The test results also reflected difficulty with attention and concentration skills and short-term memory. (*Id.*)

On May 26, 1990, she was discharged from the Park Center program because her behaviors and attitudes had not changed a great deal over the course of treatment. On October 14, 1991, Jones was admitted into the residential alcohol and drug addiction program at the Washington House in Fort Wayne, Indiana. (*Id.* at 87.) She completed most of the program, but left prior to completion after admitting to using drugs while away from the facility, and because she had to take her father to Mississippi. (*Id.* at 87, 89.)

In late 1994 Jones returned to Connerly at Family and Children's Services on a self-referral basis after having been released from a treatment center. (*Id.* at 208.) At that time she admitted that she was cocaine and alcohol dependent. (*Id.*) Jones ceased treatment after five months due to her financial situation. (*Id.*) Connerly's diagnosis at that time was Cocaine Dependence, Alcohol Abuse, and Dysthymia.[4] (*Id.*)

In February 1993 Jones returned to Park Center for a problem she was having with anger control and unresolved grief over the death of her father. (*Id.* at 139.) During the intake interview Jones had difficulty con-

---

3. This describes an IQ range that is slightly higher than that for Mental Retardation. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 45 (4th ed.1994) ("DSM–IV").

4. The main feature of Dysthymic Disorder is a chronically depressed mood that occurs for most of the day for more days than not for at least a

two year period. During such periods at least two of the following additional symptoms exist: poor appetite or overeating, insomnia or hypersomnia, low energy or fatigue, low self-esteem, poor concentration or difficulty making decisions, and feelings of hopelessness. *See* DSM–IV at 345.

centrating and became tearful. (*Id.*) She also stated that her appetite had been somewhat inconsistent. (*Id.*)

Jones was then treated by Dr. Scott W. Salon, a psychologist, and Dr. Herbert P. Trier, a psychiatrist, from at least April 30, 1993, through January 17, 1994. (*Id.* at 169.) The doctors completed a Report of Psychiatric Status. (*Id.* at 169–184.) Their diagnoses were Depression Not Otherwise Specified (NOS),[5] Substance Abuse (Marijuana), Mixed Personality Disorder, and Narcissistic and Paranoid features.[6] Their report indicates that Jones had told the doctors that she does not go out into public situations unaccompanied due to feeling scared, and that she generally isolates herself at home. (*Id.* at 170.) Jones also reported that she had overwhelming depression and anxiety, and the doctors observed that she had on occasions presented at the Family Practice Center or their offices for immediate medication due to feeling that her emotions were out of control. (*Id.*) The doctors noted that she was easily disrupted and overwhelmed by stress, and reported that despite psychotropic medication she often had difficulty sleeping and felt at risk for not being able to control her emotions, especially her anger. (*Id.*) Jones also reported considerable difficulty concen-trating due to preoccupation with problems. (*Id.*) The doctors observed that she was easily disrupted and her condition is exacerbated by stress. (*Id.*) The doctors noted they had observed emotional lability in the patient. (*Id.*) The doctors indicated that Jones could not attend to a simple repetitive task continuously for a two hour period of time, because she usually is preoccupied with worry about becoming aggressive or violent and is very limited in her ability to tolerate interpersonal stress. (*Id.*)

Jones returned again to Connerly for therapy in March of 1994. Later that year Connerly diagnosed Jones with Polysubstance Dependence (primarily cocaine, cannabis, and alcohol); Intermittent Explosive Disorder[7]; Major Depression; Borderline Intellectual Functioning; Developmental Reading Disorders;[8] Expressive Writing Disorder;[9] and Developmental Arithmetic Disorder.[10] By August of 1994, Connerly was of the opinion that Ms. Jones was unable to seek employment, which Connerly attributed to her depression and educational delays. (*Id.* at 209.)

Dr. Neil S. Shamberg, a clinical psychologist, performed a psychological evaluation on Jones in June of 1994 at the request of Vocational Rehabilitation. (*Id.* at 199–204.)

---

5. The Depressive Disorder NOS category includes disorders with depressive features that do not meet the criteria for Major Depressive Disorder, Dysthymic Disorder, Adjustment Disorder with Depressed Mood, or Adjustment Disorder With Anxiety and Depressed Mood. *See* DSM–IV at 350.

6. A Personality Disorder is an enduring pattern of inner experience and behavior that deviates markedly from the individual's culture, is pervasive and inflexible, has an onset in adolescence or early adulthood, is stable over time, and leads to distress and impairment. *See* DSM–IV at 629. A mixed personality disorder is where the presentation of the patient is "mixed" in that the criteria are not met for any single Personality Disorder but features of several Personality Disorders are present and involve clinically significant impairment. *See* DSM–IV at 631. Narcissistic features include a pattern of grandiosity, need for admiration, and lack of empathy, and paranoid features include a pattern of distrust and suspiciousness such that other's motives are interpreted as malevolent. *See* DSM–IV at 629.

7. The essential feature of Intermittent Explosive Disorder is the occurrence of discrete episodes of failure to resist aggressive impulses that result in serious assaultive acts or destruction of property. *See* DSM–IV at 629.

8. The essential feature of a Reading Disorder is reading achievement (i.e., reading accuracy, speed, or comprehension as measured by individually administered standardized tests) substantially below that expected given the individual's chronological age, measured intelligence, and age-appropriate education. *See* DSM–IV at 48.

9. The essential feature of the Disorder of Written Expression is writing skills (as measured by individually administered standardized test or functional assessment of wording skills) that fall substantially below those expected given the individual's chronological age, measured intelligence, and age-appropriate education. *See* DSM–IV at 51.

10. An essential feature of this disorder is mathematical ability (as measured by individually administered standardized test of mathematical calculation or reasoning) that falls substantially below that expected for the individual's chronological age, measured intelligence, and age-appropriate education. *See* DSM–IV at 50.

Jones fell into the "dull normal" category of intelligence; however, her Performance IQ and Full Scale IQ fell into the middle of the "borderline intellectual functioning" category. (*Id.*) She was also given a Wechsler Memory Scale test, and received a score in the borderline mentally retarded range. (*Id.*)

Dr. Shamberg's evaluation also showed Jones had problems with attention and concentration skills and short-term memory. (*Id.*) Dr. Shamberg also noted that during the testing Jones appeared tense, very upset, jittery, easily frustrated and distracted, and cried at times. (*Id.*) Jones' reading ability was at the sixth grade level, her spelling score below the third grade level, and her arithmetic score at the fourth grade level. (*Id.* at 202.) Dr. Shamberg stated that she suffered from the learning disabilities of dyslexia, dysgraphia, and dyscalculia. The functional limitations of these learning disabilities include an inability to read with comprehension at much above the late fifth grade level, the inability to spell and write much above the second grade level, and the inability to do simple arithmetic calculations much above the mid-fourth grade level. (*Id.*) Additionally, Jones' reading comprehension grade equivalent was only 5.7. (*Id.*)

Dr. Shamberg chose not to give Jones the Minnesota Multiphasic Personality Inventory ("MMPI")[11] because in his opinion her reading level was too low for her to complete it. (*Id.* at 200, 202.) Instead, he gave her the Rorschach personality test.[12] (*Id.* at 202.) Dr. Shamberg stated that she gave him a very sad, depressed picture, including several classic signs of current deep depression, including paucity of response, dysphoric and dysthymic content long, slow initial reaction times, and gory imagery. (*Id.*) Dr. Sham-

berg was of the opinion that Jones was very severely depressed, though she was clearly in contact with reality. (*Id.*)

Dr. Shamberg gave the following diagnoses: Major depression (recurrent, severe, and without psychotic features);[13] Alcohol and Cannabis dependence; Borderline intellectual functioning; Developmental reading disorder; Developmental expressive writing disorder; and Developmental Arithmetic disorder. (*Id.* at 203.) Dr. Shamberg concluded that Jones was very severely depressed and in need of psychiatric treatment, and that she was not ready for full time employment. (*Id.* at 203–04.) In fact, Dr. Shamberg suggested that Vocational Rehabilitation consider recommending that she file for Social Security disability benefits. (*Id.* at 204.)

Jones saw Dr. Juanita L. Clay from September 1994 through March 1995. (*Id.* at 263.) Dr. Clay found in her initial examination that Jones' primary presenting problems were depression, sadness, and confusion. (*Id.* at 285.) Her overall presentation was disheveled with slumped posture and generally retarded body movement. (*Id.*) Dr. Clay noted that her facial expression generally reflected depression, anger, anxiety, and some degree of mistrust. (*Id.*) Dr. Clay concluded that the quantity of Jones' relationships suggested that she is socially isolated and the general quantity of her interactions with others could be described as dependent and demanding. (*Id.* at 288.)

Dr. Clay did give Jones the MMPI test. (*Id.* at 266–274.) The MMPI results regarding validity indicated "an extremely elevated profile of a client who answered an excessive number of F scale items," and therefore the test was invalid.[14] (*Id.* at 274.) Dr. Clay

---

**11.** The MMPI is an objective personality test which employs True–False questions that specifically limit the patient's answering options. It is widely considered the most useful personality test. *See* Roscoe N. Gray, 3B ATTORNEYS' TEXTBOOK OF MEDICINE 93–76 .1 (3d ed.)

**12.** The Rorschach test is the most widely used objective personality test. However, there is no obvious socially desirable "answer" to these tests, results do not meet the requirements of standardization, reliability, or validity of clinical diagnostic tests, and interpretation thus is often

controversial. Gray, 3B ATTORNEY'S TEXTBOOK OF MEDICINE, at 93–76.2.

**13.** The essential feature of Major Depressive Disorder is a clinical course that is characterized by one or more Major Depressive Episodes without a history of Manic, Mixed or Hypomanic Episodes. *See* DSM–IV at 339.

**14.** MMPI test results may be rendered invalid because the test taker did not understand the questions, understood the questions but deliber-

reported that due to Jones' significant problems with reading, it was impossible to process appropriate psychological testing to confirm the extent of her psychological deficiency. (*Id.* at 263.)

Dr. Clay noted that Jones had continued to have depression despite more than five years of treatment through clinical agencies. (*Id.*) Dr. Clay found that Jones needed continued therapy, training, and case management because of the psychological stress she is under and her continuing problems with anger. (*Id.*) Dr. Clay also noted that even though psychotropic medication was prescribed in conjunction with talk therapy, Jones' depression remained intractable. (*Id.*) Her diagnoses were Major Depression (Recurrent) and Polysubstance dependence. (*Id.* at 265.)

In April of 1995 Jones underwent a psychological evaluation by Diane Thomas, a therapist, and Dr. J. Patel, a psychiatrist, at the request of Vocational Rehabilitation. (*Id.* at 234–244.) The purpose of the evaluation was to assess Jones' present emotional functioning as well as to ascertain her addiction history. (*Id.* at 234.) Dr. Patel and Ms. Thomas found that Jones presented with some depressive symptoms including difficulty sleeping, a decrease in motivation, a tendency to isolate, a loss of appetite, crying frequently, and suicidal thoughts. (*Id.* at 242.) They concluded that she was "a woman who has been depressed a big part of her life." (*Id.*) Their diagnostic impression was Cannabis Dependence (Severe), Dysthymia, Alcohol Dependence, and Polysubstance Dependence. (*Id.*)

### III. STANDARD OF REVIEW

An applicant for disability insurance benefits ("DIB") or SSI must establish inability "to engage in any [substantial gainful activity ("SGA") ] by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months...." 42 U.S.C. § 423(d)(1)(A)(DIB); 42 U.S.C. § 1382c(a)(3)(A)(SSI). A physical

or mental impairment is "an impairment that results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3); 42 U.S.C. § 1382c(a)(3)(D). It is not enough for the plaintiff to establish that an impairment exists. It must be shown that the impairment is severe enough to preclude the plaintiff from engaging in substantial gainful activity. *Lopez v. Secretary of Health and Human Servs.*, 798 F.Supp. 1351, 1355 (N.D.Ind.1992) (citing *Gotshaw v. Ribicoff,* 307 F.2d 840, 844 (4th Cir.1962), *cert. denied sub nom. Heath v. Celebrezze,* 372 U.S. 945, 83 S.Ct. 938, 9 L.Ed.2d 970 (1963)); *Garcia v. Califano,* 463 F.Supp. 1098, 1102 (N.D.Ill.1979). If an impairment is not found to be severe, benefits are denied. 20 C.F.R. §§ 404.1520(c), 416.920(c); *Bowen v. Yuckert,* 482 U.S. 137, 150 n. 6, 107 S.Ct. 2287, 2295 n. 6, 96 L.Ed.2d 119 (1987).

Regulations under the Social Security Act provide a five-step process ("the sequential evaluation") by which to determine if a person is disabled. According to this process, the following questions are addressed in order:

(1) Is the claimant currently unemployed?

(2) Is the claimant's impairment severe?

(3) Does the impairment meet or equal one of the list of specific impairments?

(4) Is the claimant unable to perform his or her former occupation?

(5) Is the claimant unable to perform any other work in the national economy?

An affirmative answer leads either to the next step, or on steps (3) and (5) to a determination that the claimant is disabled. A negative answer at any point other than step (3) leads to a finding that the claimant is not disabled. 20 C.F.R. § 404.1520(b)–(f); *Nolen v. Sullivan,* 939 F.2d 516, 518 n. 2 (7th Cir.1991) (citing *Garfield v. Schweiker,* 732 F.2d 605, 607 (7th Cir.1984)); *Guzman v. Bowen,* 801 F.2d 273, 274 (7th Cir.1986). The claimant bears the burden of proof in steps one through four. If this burden is

---

ately answered them randomly, or attempted to fake a negative result by simulating or exaggerat-

ing his or her perceived impairment. (*Id.*)

met, the burden then shifts to the Commissioner to demonstrate that the claimant retains the residual functional capacity ("RFC") to perform other work available in the economy. *Young v. Secretary of Health and Human Services,* 957 F.2d 386, 389 (7th Cir.1992); *Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir.1987).[15]

This Court's review on appeal focuses not on whether the claimant is disabled, "but on whether the Commissioner's findings were supported by substantial evidence." *Brewer v. Chater,* 103 F.3d 1384, 1390 (7th Cir.1997) (citing *Diaz v. Chater,* 55 F.3d 300, 305 (7th Cir.1995)). "Substantial evidence" has been described as "more than a scintilla." It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion ..." *Anderson v. Bowen,* 868 F.2d 921, 923 (7th Cir.1989) (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)); *see also Bauzo v. Bowen,* 803 F.2d 917, 923 (7th Cir.1986). "In our substantial evidence determination, we review the entire record; however, we do not substitute our judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility." *Brewer,* 103 F.3d at 1390 (citing *Diaz,* 55 F.3d at 305, 308; *Luna,* 22 F.3d at 689; *Cass v. Shalala,* 8 F.3d 552, 555 (7th Cir.1993)).

## IV. DISCUSSION

### A. The ALJ's Decision

The ALJ found at step one of the sequential evaluation that the little work Jones had performed since 1990 could not be considered substantial gainful activity due to the fact that Jones required a job coach to assist her, and jobs were of such short duration. (*Id.* at 12.) At step two, the ALJ found that Jones' polysubstance drug abuse, obesity, and borderline personality disorders constituted severe impairments. (*Id.* at 18.) However, the ALJ found that these severe impairments did not meet or equal the criteria for any listing contained in the regulations.

At step four, the ALJ found that Jones could do her past relevant work, and therefore was not disabled. (*Id.* at 26.) In reaching this conclusion, the ALJ focused on the minimal effect that Jones' severe mental impairments have on her daily living activities. The ALJ noted that Jones' testimony indicated that she regularly ate out with a friend, took care of her household, read true crime stories, and watched television. The ALJ thus concluded that Jones' ability to perform these daily activities, as well as her reliability in seeking treatment for her mental impairments, undermined the credibility of her subjective testimony and demonstrated that she could in fact return to her past work.

After careful consideration of the entire record, the ALJ made the following findings:

1. The claimant has not engaged in substantial gainful activity since January 1, 1991.

2. The medical evidence establishes that the claimant has severe impairments personality disorder, polysubstance abuse addiction, and obesity, but that she does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P Regulations No 4.

3. The evidence of record does not support the claimant's subjective complaints.

4. The claimant has the residual functional capacity to perform work-related activities except for work involving either extensive or limited public contact (20 CFR 416.945). Further, the claimant cannot adjust to complicated or detailed instructions. The claimant cannot work at a regimented pace, such as on an assembly line.

5. The claimant's past relevant work as salvage worker did not require the performance of the work related activities precluded by the above limitations (20 CFR 416.965).

6. The claimant's impairments do not prevent the claimant from performing her past relevant work.

---

**15.** The shifting of the burden of proof is not mandated by statute, but is a long-standing judicial gloss on the Social Security Act. *Walker,* 834 F.2d at 640 n. 3.

7. The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR 416.920(e))

## B. Analysis

It is well-settled that an ALJ must "sufficiently articulate his assessment of the evidence to assure us that the ALJ considered the important evidence and to enable us to trace the path of the ALJ's reasoning." *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir.1996) (citations omitted). *Accord Diaz*, 55 F.3d at 307; *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir.1992); *Steward v. Bowen*, 858 F.2d 1295, 1298 (7th Cir.1988). This responsibility is heightened when the alleged disability is mental, rather than physical. *See* 20 C.F.R. § 416.920a (outlining special procedures to be used in evaluating mental impairments). Indeed, the Seventh Circuit has recognized that the ALJ's duty to sufficiently articulate his assessment of the evidence is particularly important when the alleged mental disability is depression:

> Severe depression is not the blues. It is a mental illness; and health professionals, in particular psychiatrists, not lawyers or judges, are the experts on it. [A claimant] is entitled to a decision based on the record rather than a hunch. The salient fact of record is the testimony of the psychiatrist, a disinterested as well as expert witness. Everything else is rank conjecture.

*Rohan*, 98 F.3d at 970–71 (quoting *Wilder v. Chater*, 64 F.3d 335, 337–38 (7th Cir.1995)).

■ Of course, the mere existence of medical evidence suggesting a claimant suffers from depression, or any other mental illness, does not entitle a claimant to a finding of disabled. But ALJs are not mental health experts, and when the record contains evidence suggesting the claimant suffers from a mental disability, an ALJ may not ignore it in formulating his decision. *Id.* An ALJ's failure to address evidence of a mental disability, when such evidence is clearly in the record, renders the ALJ's decision an impermissible lay opinion of "rank conjecture." *Id.*

■ The record in this case is replete with references from Ph.Ds, psychologists, psychiatrists, and counselors that Jones suffers from depression. In fact, the ALJ's opinion recognizes that Connerly and Dr. Shamberg diagnosed Jones with major or severe depression. (Record at 13, 14.) Yet the ALJ did not consider depression as one of Jones' possible mental impairments when he evaluated the medical evidence. (*Id.* at 18.) The ALJ's failure to evaluate Jones' depression as a potentially disabling mental impairment clearly constitutes reversible error. *Rohan*, 98 F.3d at 970–71; *Wilder*, 64 F.3d at 337–38.

■ Moreover, the ALJ also committed reversible error in the way he evaluated Jones' alleged mental impairments. The ALJ found Jones' mental impairments did not disable her because these impairments did not substantially limit her life's activities such as cleaning her household, eating out, etc. The ALJ also supported his finding of not disabled with the fact that Jones reliably sought treatment for her mental illnesses. As discussed *supra*, the Seventh Circuit has repeatedly stated that mental disabilities must be treated differently than physical disabilities. The facts of *Wilder* provide a pointed example. The claimant in *Wilder* alleged depression as a disabling mental impairment. The ALJ found the claimant not disabled because he believed the claimant's abilities to perform certain daily activities, such as working as a security guard and carrying a gun, were inconsistent with a diagnosis of depression. The *Wilder* court reversed, holding that the daily physical activities of a claimant are not relevant to a disability determination based on mental impairments. *Wilder*, 64 F.3d at 337–338 ("Severe depression is not the blues ...").

Simply put, the ALJ employed an impermissible method of evaluating Jones' alleged mental impairments because he proceeded exactly as the ALJ did in *Wilder*: he found Jones not mentally disabled because she could perform daily physical activities.[16] In

16. The ALJ's use of Jones' responsibility in seek- ing treatment for her mental impairments to

---

so doing he ignored the opinions of Connerly, the counselor with the most contact with Jones, and Dr. Shamberg, both of whom diagnosed Jones with severe or major depression. *See Rohan,* 98 F.3d at 970. The ALJ's failure to even mention these diagnoses in his evaluation of Jones' mental impairments does not enable us to trace the path of his reasoning, and leads us to conclude that he committed reversible error by substituting his own judgment for that of the medical experts. *Id.* at 971.[17]

### C. Contract with America Advancement Act

On remand, the ALJ is also directed to consider the application of Congress' recent amendments to the Social Security Act found in the Contract with America Advancement Act of 1996, Pub.L. No. 104–121, § 105(b)(1), 110 Stat. 847, 853 (codified as amended at 42 U.S.C. § 1382c(a)(3)(J)).[18] This legislation was passed on March 29, 1996, to eliminate alcoholism or drug addiction as a basis for obtaining disability benefits:

> An individual shall not be considered disabled for purposes of this title if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled.

§ 105(b)(1), 110 Stat. at 853.[19] The question of whether alcoholism or drug addiction is a "contributing factor" material to a finding of disability turns on whether the individual has a disability independent of the alcoholism or drug addiction. 20 C.F.R. § 416.935(b)(1) ("The key factor ... is whether we would still find you disabled if you stopped using drugs or alcohol.")

As discussed *supra,* Jones was an admitted drug addict during the time period for which she is seeking SSI. Notwithstanding the assertions of both Jones and the Commissioner, the record is not clear whether or to what extent Jones' drug use has contributed to her mental ailments. This determination will be crucial to the Commissioner's assessment of whether Jones is entitled to SSI benefits. *See Boehm v. Chater,* 969 F.Supp. 31, 34 (S.D.Iowa 1997); *Davis v. Chater,* 952 F.Supp. 561, 567–68 (N.D.Ill.1996); *Luther v. Chater,* 938 F.Supp. 538, 541 n. 1 (S.D.Iowa 1996).

### V. CONCLUSION

For the foregoing reasons, the decision of the Commissioner denying Jones SSI benefits is REVERSED and REMANDED for further development of the record, particularly in light of the Contract with America Advancement Act.[20]

So Ordered.

---

support his finding of not disabled seems particularly ill-founded. Moreover, fewer people would actually seek treatment if the very fact of obtaining mental health treatment becomes a basis for a finding of not disabled.

**17.** We note in passing another potential reason for remanding this cause that was not pursued by Jones in her appeal. 20 C.F.R. § 404.1520a(d)(DIB), and § 416.920a(d)(SSI), require the completion of a standard document, commonly known as the Psychiatric Review Technique Form ("PRTF"), at each level of review of mental impairment cases. The PRTF outlines the steps of the special procedures the Commissioner is required to use in evaluating mental impairments. It is reversible error to fail to complete a PRTF at all, or for an ALJ to neglect to address the PRTF in his or her evaluation of the evidence. *See, e.g., Stambaugh v. Sullivan,* 929 F.2d 292, 295–96 (7th Cir.1991); *Ray v. Bowen,* 843 F.2d 998, 1000 (7th Cir.1988). The record here does not show a PRTF was completed at *any* level of review. We trust the Commissioner will carefully follow all applicable regulations upon remand.

**18.** The pertinent legislative history for § 105 is found in H.R.Rep. No 104–379, at 20 (1997 WL 717401 (Leg.Hist.), p. 47).

**19.** The provisions of § 105(b)(2) became effective on March 29, 1996, and therefore apply to this case. *See* Pub.L. No. 105–33, § 5525(a)(2), 111 Stat. 251, 624 (1997) (clarifying the effective date of the Contract of America Amendments to encompass SSI disability claims for which administrative or judicial review was pending on March 29, 1996). The ALJ did not render his decision until May 13, 1996, and obviously judicial review has remained pending until the date of this order.

**20.** The Court is mindful of Jones' sound argument for a judgment directing the Commissioner

to award SSI, rather than a judgment remanding for additional factfinding. However, the question of whether Jones' drug addiction is a contributing factor material to her alleged disability must be answered in the first instance by the ALJ. *See Lindner v. Sullivan,* 902 F.2d 1263, 1267 (7th Cir.1990) (remanding rather than directing judgment because significant issue had been left "in limbo").