Velma J. MARTIN, Plaintiff,

v.

Kenneth S. APFEL, Commissioner, Social Security Administration, Defendant.

No. CIV. A. 99:0898JRJMF.

United States District Court, District of Columbia.

Aug. 30, 2000.

**10**

Velma J. Martin, Washington, DC, pro se.

Jeffrey Stuart Gutman, George Washington University Law School, Community Legal Clinics, Washington, DC, for Plaintiff.

Doris D. Coles–Huff, Paul Mussenden, U.S. Atty's. Office, Washington, DC, for Defendant.

## REPORT AND RECOMMENDATION

FACCIOLA, United States Magistrate Judge.

Pursuant to Local Civil Rule 72.3, this matter has been referred to me, a Magistrate Judge, for the purpose of hearing and recommendation. I, therefore, hereby issue this *Report and Recommendation* based upon my review of the administrative determination in this case.

### Facts

Ms. Velma J. Martin ("Martin") is a 64 year-old former secretary. She last worked in the Spring of 1993. *Administrative Record* at 54 ("R."). Her health has deteriorated since that time. She suffers from a number of physical and psychological ailments which she claims that her render her disabled under 42 U.S.C.

§ 423 (1994) and therefore entitle her to Supplemental Security Benefits and Disability Insurance Benefits. The Social Security Administration denied her initial application for benefits. On appeal of that decision, her claim was remanded by an Administrative Law Judge ("ALJ") to a state agency for reconsideration of her condition due to new evidence of a mental impairment. (R. at 253–255.) She was denied benefits by the agency and appealed that decision to another ALJ. (R. at 274, 282.) The second ALJ held a hearing in which a vocational expert testified that there was no work Martin could perform. The ALJ nevertheless concluded that Martin was capable of performing medium work resuming her former work as a secretary. (R. at 27–31). Martin applied to have the decision reviewed by an Appeals Council pursuant to 20 C.F.R. §§ 404.970 and 416.1470 (2000). The Council denied review. (R. at 6.) Martin then filed this civil action against the Commissioner of the Social Security Administration ("Commissioner") pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) (1994) to receive the denied benefits.

### Medical Evidence of Physical Impairment

Ms. Martin has had two treating physicians in the past ten years. (R. at 226.) She transferred from the care of Dr. Henry Williams to that of Dr. Lewis Marshall on February 1, 1994. (R. at 226.) According to Dr. Marshall, Martin complained of migratory joint pain, recurrent infections, chronic hypertension, hiatal hernia, and myalgias. (R. at 228.)

Dr. Joel Taubin, a medical examiner for the Social Security Administration, examined Martin on October 10, 1993, after she first applied for Social Security disability benefits. (R. at 165.) He diagnosed "no hypertension" and believed that the patient's hiatal hernia was well controlled. (R. at 167.) He did not find any major respiratory symptoms, but did diagnose minor bronchial problems which occasion-

ally cause wheezing when she was exposed to damp or cold weather (R. at 165.) He also found minor arthritis in the knee and elbow and chostochondritis of the shoulder (R. at 167.) He made no findings as to disability or depression. He did find that Martin could both walk and sit without any difficulties other than those caused by her bronchial problems. (R. at 168.)

When Martin's case was remanded for consideration of mental ailments, Dr. Gary Koritzinsky examined Martin for the Social Security Administration. (R. at 357.) The consultation took place on September 13, 1995. In contrast to Dr. Taubin, Dr. Koritzinsky found that Martin did not have an arthritic impairment. (R. at 359.) He did find, however, that Martin suffered from obstructive airways disease. (R. at 360.) He further concluded that Martin suffered from hypertension, chronic fatigue syndrome, arthralgias, and depression. (R. at 360.) He opined that Martin "may want to consider formal psychiatric evaluation to determine whether her depression and chronic fatigue meet criteria for disability." (R. at 360.)

*Medical Evidence of Psychological Impairment*

According to Drs. Marshall and Koritzinsky, Martin suffers from depression. (R. at 228, 360.) From 1994 through 1996, Martin underwent two psychiatric examinations and testing with a psychologist to determine the affect of her mental ailments on her ability to maintain substantial gainful employment.

On August 29, 1994, Doctor Richard Ratner held an extended psychiatric interview with Martin. (R. at 247.) Subsequent to the interview, Dr. Ratner administered a Millon Clinical Multiaxial Inventory ("MCMI–II") (R. at 247.) This test is used for psychological examination and screening and is scored on a computer. (R. at 247.) The doctor based his findings on both the psychiatric interview and the Millon test. (R. at 247.)

During the mental status interview, the doctor noted that Martin was oriented to all spheres, alert, and attentive. (R. at 250.) She could repeat six numbers forward, five numbers backward, and perform "serial sevens" without error. (R. at 250.) Dr. Ratner found her of at least normal intelligence. (R. at 250.) She appeared situationally depressed and there appeared to be no signs suggestive of a thought disorder or of delusions or paranoia. (R. at 250.) The mental status interview thus revealed a non-psychotic woman with no evidence of organic deterioration who tended to focus on her physical problems. (R. at 250.)

The MCMI–II psychological test, by contrast, revealed markedly different results than the mental status interview. (R. at 251.) The MCMI–II test found Martin's condition consistent with a paranoid disorder, having ideas of "reference" and irrational jealousy. (R. at 251.) She appeared to have an anxiety disorder and a somatoform disorder. (R. at 251.) Dr. Ratner found that she presented a "difficult case in which the clinical picture appears benign … while the psychological testing reveals a very disturbed woman who must work hard to keep the lid on her powerful and troubling emotions." (R. at 251.) Dr. Ratner concluded that Martin was probably disabled for useful work and appeared to have been for the past year.

On August 21, 1995, Dr. Richard Schaengold conducted a consultative psychiatric exam of Martin for the Social Security Administration. (R. at 354.) Martin performed some of the same recitation and memory exercises with Dr. Schaengold as she had with Dr. Ratner. (R. at 355.) Dr. Schaengold did not at any time perform any diagnostic testing of Martin.

Based on clinical examination, Dr. Schaengold found Martin cooperative, of above average intelligence, and lacking any signs of an underlying thought disorder or delusions. (R. at 355.) He noted that her prognosis was difficult because most of her

problems were described as physical ailments. (R. at 355.) Further, he diagnosed her as likely to have a somatization disorder. (R. at 355.) In the doctor's psychiatric opinion, Martin seemed capable of reasonable adaptation. (R. at 356.)

Martin underwent a series of diagnostic psychological tests on August 2, 1996, administered by Dr. Ronald Wynne. (R. at 385.) Dr. Wynne used behavioral and interview observations, Human Figure Drawings, the Beck Depression Scale, a Coolidge Axis II Inventory ("CATI"), the Rorschach test, and the Wechsler Adult Intelligence Scale with a vocabulary subtest to evaluate Martin. (R. at 385.) Dr. Wynne found Martin to be cooperative, motivated to share her thoughts and feelings, and of at least average intelligence. (R. at 386.) However, he also observed "a highly strung manner of expressing herself, as though experiencing chronic tension and anxiety." (R. at 369.) During the evaluation, Martin expressed great frustration about her emotional, family and vocational problems (R. at 386).

Dr. Wynne's diagnostic testing revealed a woman who was "significantly depressed". (R. at 386.) Dr. Wynne described Martin as a woman of above average intelligence who had problems with logical thinking, mood control, and interpersonal relationships. (R. at 388.) These problems seemed to be tied to her chronic emotional problems and her tendency to be preoccupied with her physical condition. (R. at 388.) He concluded that her coping skills seem to be related more to her mental health than to symptoms caused by physical disorders. (R. at 388.) Dr. Wynne ultimately recommended intensive psychotherapy and possibly medication for Martin. (R. at 389.) Finally, he urged that Martin not seek employment until her mental condition improved. (R. at 389.)

*Hearing Record*

At the hearing held on March 3, 1997, before Administrative Law Judge C.J. Sturek ("the ALJ"), Martin testified as to the composition of her household, her education, her prior occupation, and her daily activities. She also testified as to the physical and mental limitations created by her ailments and medications. As of the date of the hearing, Martin lived with her nineteen year-old son. (R. at 51.) She had taken several years of college courses and was 6 months from earning a BA when she stopped taking classes. (R. at 53–54, 70–71.) She worked as a full-time secretary in a church until January 1993. (R. at 54–55.) At Martin's most recent job, she worked as a part-time secretary for the D.C. Apartment Improvement Agency from February 1993 until April 1993. (R. at 56–59.)

Martin testified that she spends most of the day painting, watching television, and sleeping. (R. at 66, 69.) She needs to rest when she walks or stays on her feet more than 20 minutes at a time. (R. at 53.) She shares housework with her son. At her job as a secretary she would carry 20 pound files occasionally but never more than 50 pounds. (R. at 58.) She complained that even picking up her great grandson twice makes her tired and causes pain due to her hiatal hernia. (R. at 76.) She is able to groom herself properly, as all the doctors who examined her noticed. In the mornings she helps her son prepare for school and then takes a number of prescription medications. (R. at 74.) She takes her medication in the morning and then naps for three hours from around 8:00 to 11:00 AM. (R. at 77.) She goes to bed around 12:00 AM each night. (R. at 77–78.) From 11 a.m. to midnight, she is inactive. (R. at 78.)

Vocational expert Jan Howard testified at the ALJ's recommendation. (R. at 78.) Ms. Wagnor used Martin's testimony to determine whether, considering her age, education, prior work experience, and information which the expert had about the national job market, occupations exist which Martin could perform. The vocational expert opined that Martin's occupation would be classified as light level file

clerk, but that due to her sleep pattern there was no work that she could perform. (R. at 81–82.)

### Discussion

#### Scope of Review

The Social Security Act allows a person to file a civil action to obtain review of a decision by the Commissioner of Social Security. 42 U.S.C. § 405(g) (1994), 42 U.S.C. § 1383(c)(3) (1994). The final decision of the Commissioner is conclusive if supported by substantial evidence and untainted by an error of law. *Davis v. Shalala*, 862 F.Supp. 1, 4 (D.D.C.1994).

It is the duty of the ALJ to make findings of fact and to resolve conflicts in the evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir.1990). In reviewing an administrative decision, a court may not determine the weight of the evidence, nor substitute its judgment for that of the Secretary if her decision is based on substantial evidence. *See id.* Instead, the reviewing court must carefully scrutinize the entire record to determine whether the Secretary, acting through the ALJ, has analyzed all the evidence and has sufficiently explained the weight he has given to obviously probative material. *See Davis*, 862 F.Supp. at 2. Because the broad purposes of the Social Security Act require a liberal construction in favor of disability, the court must view the evidence in the light most favorable to the claimant. *See id.* at 4.

The reviewing court must also determine whether credible evidence was properly considered. *See Dionne v. Heckler*, 585 F.Supp. 1055 (D.Me.1984). The ALJ's final decision must contain "a statement of findings and conclusions, and the reasons or the basis therefor, on all material issues of fact, law, or discretion presented on the record." 5 U.S.C. § 557(c) (1994). An ALJ cannot merely disregard evidence which does not support his conclusion. *See Dionne*, 585 F.Supp. at 1060. It is reversible error for an ALJ to fail in his written decision to explain sufficiently the weight he has given to certain probative items of evidence. *See Davis*, 862 F.Supp. at 2. Failure to develop the record makes it difficult for a reviewing court to determine errors in application of law. The requirement to explain findings supported by substantial evidence facilitates proper application of their limited scope of review. A reviewing court should not be left guessing as to how the ALJ evaluated probative evidence. *See Taylor v. Heckler*, 595 F.Supp. 489, 492 (D.D.C.1984); *Dionne*, 585 F.Supp. at 1060.

#### Disability

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A) (1994). The Social Security Act provides a frame work with which to evaluate evidence to determine disability. 42 U.S.C. § 423 (1994). Four types of evidence are to be considered in making a disability determination: "(1) Objective medical facts or clinical findings; (2) diagnoses of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and corroborated by other observers; and (4) the claimant's age, education, and work history." *Rodriguez v. Schweiker*, 640 F.2d 682, 685 (5th Cir.1981). All four of these elements must be regarded in combination, and it is error for an ALJ to disregard any one of them. *See id.*

Certain types of opinion evidence are accorded more weight than others. *See* 20 C.F.R. §§ 404.1527, 416.927 (2000). For example, more weight is given to those medical opinions originating from a longer treating relationship or supported by objective medical testing and findings. *See* 20 C.F.R. §§ 404.1527(d), 416.927(d) (2000). Furthermore, the more consistent an opinion is with the record as a whole, the more weight that opinion is given. *See*

**14**

20 C.F.R. §§ 404.1527(d)(4), 416.927(d)(4) (2000).

## The Decision

The ALJ found:

1. As of June 10, 1993, Martin met the disability insurance status requirements of the Social Security Act and that she continued to meet them through 1997.

2. She had not been engaged in substantial gainful activity since June 10, 1993.

3. Martin's chronic obstructive pulmonary disorder, pain disorder and chronic fatigue, while severe, did not amount to an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4 (20 C.F.R. §§ 404.1521 and 416.921 (2000)). Martin's alleged hypertension, bronchitis, arthritis, dysthymic disorder, status-post nephrectomy, personality disorder and hiatal hernia were non-severe.

4. Her subjective complaints were credible only to the extent that they restricted her from the full range of medium work.

5. Martin has the residual functional capacity to work, except for lifting more than 50 pounds at a time or frequently lifting more than 25 pounds. There were no non-exertional limits.

6. Martin's prior work did not require Martin to exceed the limits of Finding # 5.

7. Martin's impairments did not limit her from performing her past work as a secretary.

8. Martin was therefore not under a disability as defined in the Social Security Act at any time through the date of the decision.

(R. at 29–30.)

In arriving at these findings, the ALJ first concluded that Martin retained the ability to lift up to 50 pounds at a time and therefore retained the ability to perform "the exertional and nonexertional requirements of the full range of medium work." (R. at 30.) He found that the "medical evidence shows that the claimant has chronic obstructive pulmonary disease, mild asthma, pain disorder and chronic fatigue." (R. at 27.) and that it was "reasonable to conclude that these conditions could cause the kind of symptoms and exertional limitations that the claimant has described." (R. at 27.) He concluded, however, that these symptoms were not as severe as Martin complained and her physicians had found.

The ALJ found support for his conclusion in the report of Dr. Koritzinsky that (1) Martin's spirometry tests results were consistent with mild obstructive airway disease, secondary to smoking; (2) Martin did not appear to have significant coronary disease; (3) her complaints of fatigue were secondary to her obstructive pulmonary disease.

He also relied on Martin's testimony that she was able, for example, to cook, clean, shop, visit friends, drive an automobile, lift up to 25 pounds, stand for 15 to 20 minutes and sit for an hour. He then listed, without further comment or elucidation of their effects, seven medications Martin takes.

The ALJ then concluded that "claimant's allegations of subjective symptoms and the severity of the limitations arising therefrom are fairly credible but only to the extent that they limit her to the full range of medium work." (R. at 30.)

He reached this determination despite (1) the opinion of Dr. Marshall that Martin was "totally disabled because of chronic fatigue syndrome, which adversely affected her concentration and memory" (R. at 28.); (2) the opinion of Dr. Ratner that Martin's psychological testing "provided a picture of a person with a moderately severe mental illness" (R. at 28.); (3) Dr. Wynne's conclusion that Martin's condition warranted in-

tensive psychotherapy and that she was not even capable of part time work until she got it (R. at 389.); and (4) the opinion of the vocational expert that due to Martin's sleep pattern there was no work she could perform. (R. at 81–82.)

As now will be explained, the ALJ's decision must be reversed because (1) the ALJ ignored probative and uncontradicted evidence that Martin was disabled and (2) dismissed irrationally the medical opinions of Doctors Marshall, Ratner and Wynne.

### The ALJ Ignored Highly Probative Evidence

■ The ALJ summarized Martin's testimony as to her daily activities but ignored her testimony that the medication she takes causes her to have to sleep from 8 a.m. to 11 a.m daily. He also ignored the testimony of the vocational expert that this sleep pattern means that there was no work that Martin could perform.

The ALJ's failure to consider this uncontradicted, probative evidence that goes to the very heart of the case before him dooms his opinion. If there is one fundamental principle guiding judicial review of an ALJ decision in a Social Security case, it is that the ALJ may not ignore evidence inconsistent with his opinion without explanation. *See Dionne*, 585 F.Supp. at 1060. This is particularly so when a vocational expert is called, lest the court be left with a record which suggests that the ALJ simply substituted his judgment of what the claimant could do for the uncontradicted testimony of an expert in the field. *See id.* As a result of the ALJ's ignoring the testimony as to the significance of Martin's sleep pattern, the ultimate decision in this case is that Martin is capable of working an eight hour day even though to do so she will have to find an employer gracious enough to permit her to sleep for one half of the working day. Obviously, such an absurd conclusion cannot possibly be described as being based on substantial evidence and in accordance with the law.

The same result is achieved by using 'a different analysis. Step three of the five step process used by the Social Security Administration to evaluate a disability states that if the claimant has an impairment(s) which meet(s) the durational requirement and is listed in Appendix 1 or is equal to a listed impairment(s), the Social Security Commissioner will find the claimant disabled without considering age, education, and work experience. *See* 20 C.F.R. § 404.1520(d) (2000). "Equal" in this section means equal in severity. *Bowen v. Yuckert*, 482 U.S. 137, 141, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987). A "severe impairment" is an impairment which significantly limits physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c)(2000).

> In determining whether an individual's physical or mental impairment(s) are of a sufficient medical severity that such impairment(s) could be the basis of eligibility under this section, the Commissioner of Social Security shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity. If the Commissioner of Social Security does find that a medically severe combination of impairments, the combined impact of the impairments shall be considered throughout the disability determination process.

42 U.S.C. § 423(d)(2)(B) (1994).

■ The ALJ is therefore required by this statutory and regulatory regiment to consider the cumulative effects of all claimant's ailments and, if relevant, medications. As to the latter, the Commissioner should consider the type, dosage, effectiveness and side effects of any medication taken to deal with an applicant's ailments. *See* 20 C.F.R. §§ 404.1529(c)(3)(iv), 416.929(c)(3)(iv) (2000). It is insufficient to list the impairments individually and to state that separately they are non-severe. *See Cook v. Heckler*, 783 F.2d 1168, 1174 (4th Cir.1986). The ALJ must instead

make a particularized finding on the effect of combination of impairments and, if necessary, the medication that the claimant must take. *See Hines v. Bowen,* 872 F.2d 56, 59 (4th Cir.1989).

In the present case, the ALJ did not properly consider or explain the effect of the combination of impairments or the consequences to Martin of the sleep inducing medication she takes to control them. Remarkably, he never considered in any way the fact that for Martin the combination of her ailments and the medication she took for them make her sleep for three hours each day from 8:00 AM to 11:00 AM. His ignorance of that crucial reality was truly "Hamlet without the Dane." This failure on the part of the ALJ constitutes an obvious violation of his obligation to view Martin's situation not atomistically but synergistically by understanding the interrelated consequences to her of her physical and psychological problems and of the medication she had to take to secure relief from them.

### The ALJ Dismissed Irrationally the Medical Opinion of Drs. Marshall, Ratner and Wynne

■ In assessing the psychological evidence, the ALJ favored the report of the SSA physician, Dr. Richard Schaengold, who performed a consultative psychiatric examination of Martin and dismissed the contrary conclusions of Doctors Wynne and Ratner. (R. at 24–25; 28–29.) Dr. Schaengold never administered any psychological tests to Martin while Doctors Wynne and Ratner did. The ALJ never commented upon this difference and thereby implicitly viewed the doctors' opinions of equal probative force. 20 C.F.R. § 404.1527(d)(3) (2000), however, understandably states that the more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight the Social Security Administration will give that opinion. To equate the three opinions is to equate those opinions predicated on interviews and testing, using recognized scientific protocols designed to arrive at objective, verifiable conclusions, with a merely consultative opinion, lacking in objective measurements. Such comparison obliterates a significant difference which the science itself acknowledges.

Furthermore, the evidence in this record indicates that the more in-depth testing disclosed problems which a purely consultative exam may have missed:

> This is one of those difficult cases in which the clinical picture appears benign, i.e., there is no overt evidence of a psychiatric condition that is disabling, while the psychological testing reveals a very disturbed woman who must work hard to keep the lid on her powerful and troubling emotions. (R. at 251.)

The ALJ's failure to appreciate the significant difference between the opinions based on significant testing and the opinion based on one interview in the teeth of the evidence of the importance of that difference compels the conclusion that he erred in a most fundamental way in his assessment of the evidence.[1]

### The Opinions of Ratner and Wynne

The ALJ was also dismissive of the opinions of doctors Ratner and Wynne because (1) Ratner found that there was no overt evidence of a psychological condition that was disabling, which seemed inconsistent with Ratner's ultimate conclusion that Martin was suffering from a mental illness and therefore disabled from useful work. (R. at 28.) The ALJ quoted, in support of his conclusion, a phrase from Ratner's report, to wit, "there was [sic][2] no overt

---

**1.** I note that the ALJ seemed to dismiss two of Martin's doctors' conclusions that she was disabled as invading his power to determine whether she was disabled. (R. at 28.) The hoary relic that experts should not express an opinion as to the ultimate issue, rejected by the Federal Rules of Evidence (R. 704), does not eliminate the ALJ's obligation to consider the validity of the analysis underlying the opinion expressed.

**2.** "Is" is the verb in the original.

evidence of a psychiatric condition that is disabling ." (R. at 251.) That phrase occurs in the following sentence:

> This is one of those difficult cases in which the clinical picture appears benign, i.e., there is no overt evidence of a psychiatric condition that is disabling, while the psychological testing reveals a very disturbed woman who must work hard to keep the lid on her powerful and troubling emotions.

(R. at 251.)

Thus, what the ALJ deemed to be evidence that Ratner was finding the absence of any indication of a psychiatric condition is, in fact, evidence of the precise contrary, that Ratner was finding that Martin is a "very disturbed woman." While the ALJ is free to evaluate the evidence as he sees fit, he cannot contort its meaning to arrive at a conclusion which is the converse of what the evidence indicates.

The ALJ was nearly as dismissive of Dr. Wynne. The ALJ construed a sentence in Wynne's report recommending that Martin not seek employment "at this time" (R. at 389.) as permitting the inference that Martin was capable of working. This imputed to Wynne the belief that Martin could or could not work as she saw fit and was not disabled from working. That, however, is not what Wynne concluded. As I have explained, Wynne found a significant, near startling, difference between what the interview of Martin disclosed and what the psychological testing revealed. The latter indicated "the presence of moderately severe mental illness" with a diagnosis of Somatization Disorder and probable personality disorder. (R. at 385.) The report then indicated that Martin (1) displayed "ideational discontinuity and fault conceptualization that interfere with logic, judgment, and effective decision making" (R. at 386.); (2) "demonstrate[d] an enduring pattern of difficulties with cognition (concentration, attention) affectivity (depression) and interpersonal functioning(conflict and social withdrawal) that are suggestive of a personality disorder" (R. at 387–388.);

(3) "exhibits obsessional and paranoid expression of these psychological difficulties." (R. at 388.)

Dr. Wynne's recommendations were that:

1. Martin was in need of intensive psychotherapy.

2. Family therapy would be helpful.

3. Martin might benefit from participation in a stress clinic.

4. Martin required ongoing psychiatric consultation regarding her need for anti-depressant, anti-anxiety, or other medication.

5. Martin should be under the care of a primary care physician for management of her illness and supervision of her medication.

Wynne then concluded:

> In order for Ms. Martin to have the time and energy to seek the help and support she needs (as outlined above), it is recommended that she not seek employment at this time. At such time as her mental health improves, she may be capable of part-time employment.

(R. at 388–89).

As is obvious, it is impossible to infer from this statement a concession by Wynne that Martin was able to work. The converse is true. Wynne described Martin as enduring an inability to think clearly and logically, as being paranoid and obsessive, and therefore in obvious need of intensive psychotherapy and physician regulated medication. Her condition was so poor that she was not even capable of part time employment and would be capable of it only if her mental health improved. To find in this report the factual premise for an inference by Dr. Wynne that Martin was capable of full time work, let alone full time work as a secretary, is to read into it the converse of what Dr. Wynne found. It is, after all, inconceivable that a doctor who concluded that Martin was incapable of part time work without an intensive regiment of psychotherapy and medication

was simultaneously concluding that she was immediately capable of full time work before she had the therapy and the medication. Yet, that is what the ALJ concluded.

### The Opinion of Dr. Marshall

On June 19, 1995 Dr. Marshall reported that Martin complained of intensive and recurrent joint and muscle pain, depression, and chronic fatigue. Dr. Marshall diagnosed her as being chronically depressed with symptoms of chronic fatigue syndrome. Acknowledging the difficulty of diagnosing chronic fatigue syndrome, Dr. Marshall indicated that "psychiatric reports would be of assistance in determining the true degree of her disability." (R. at 228.) He nevertheless was certain that "[a]t the present time, because of chronic fatigue, she is unable to function in a productive capacity." (R. at 228.)

Subsequently, Dr. Marshall completed a questionnaire in which he again indicated that Martin suffered from chronic fatigue syndrome. (R. at 443–447.) He found that Martin suffered from poor concentration, memory and generalized weakness associated with that syndrome. (R. at 445.)

Despite Dr. Marshall's findings, the ALJ concluded that there was little or no evidence to support the diagnosis of chronic fatigue syndrome and that a diagnosis of depression was not within Dr. Marshall's expertise as an internist. (R. at 29.)

As to the latter, one is hard pressed to understand how else any doctor could describe and diagnose a patient who reports being depressed. Moreover, as the ALJ did not seem to understand, the symptoms Martin reported, including joint and muscle pain, impaired memory and concentration, and a general feeling of lassitude, are certainly consistent with the diagnosis of chronic fatigue syndrome which the Secretary of Health and Human Services has adopted for evaluating claims premised on chronic fatigue syndrome. *See Fragale v. Chater,* 916 F.Supp. 249, 253 (W.D.N.Y.

1996). Dr. Marshall's diagnosis was therefore supported by the symptoms he observed. The ALJ's conclusion to the contrary was therefore unsubstantiated and cannot stand.

### Conclusion

In arriving at the conclusion that Martin was not disabled, the ALJ ignored evidence which directly established that Martin was disabled due to chronic fatigue syndrome and her sleep pattern, induced by her need for medication to control her many symptoms. He was irrationally dismissive of psychiatric evidence which indicated that Martin was seriously mentally ill and incapable of even part time work without a regimen of intensive psychotherapy and medication. He flatly ignored the testimony of the vocational expert that Martin was disabled. His ultimate conclusion that Martin was not disabled was not based on substantial evidence. To the contrary, it was arbitrary and arrived at by irrationally disregarding highly probative evidence.

■ Where there is additional evidence which can be produced to remedy defects in the original administrative hearing, a court should remand to the ALJ for a new hearing. *See Bastien v. Califano,* 572 F.2d 908, 913 (2nd Cir.1978). However, where the record in the case has been thoroughly developed, and a rehearing would merely function to delay the award of benefits, reversal is appropriate. *See Gold v. HEW,* 463 F.2d 38, 44 (2nd Cir. 1972).

■ The record in this case, which is fully developed, contains the opinion of three doctors who indicated that Martin is disabled, and the opinion of the vocational expert who determined that there was no work that Martin could perform. There has been no evidence presented in this case that is contrary to the view that Martin is disabled. The two doctors that the ALJ relied upon in making his determination that Martin was not disabled do not speak to the issue. There is no evidence

other than the evidence supporting the conclusion that Martin suffers from a disability.

I therefore believe that it is appropriate, under the Social Security Act, to reverse the ALJ's determination and remand with the direction that Martin be awarded disability benefits to commence immediately.