**Ella ELBERT, Plaintiff,**

v.

**Jo Anne BARNHART, Commissioner of the Social Security Administration, Defendant.**

No. 04–C–43.

United States District Court, E.D. Wisconsin.

Aug. 20, 2004.

David F. Traver, Milwaukee, WI, for Plaintiff.

Nora S. Barry for Defendant.

### DECISION AND ORDER

ADELMAN, District Judge.

Plaintiff Ella Elbert brings this action under 42 U.S.C. § 405(g) seeking judicial review of the decision of defendant JoAnne Barnhart, Commissioner of the Social Security Administration, denying her application for supplemental security income (SSI). Plaintiff alleged that she was unable to work due to shoulder, knee and back pain, but the Administration denied her claim. Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), but the ALJ also denied her claim. When the Appeals Council rejected plaintiff's request for review, the ALJ's decision became the final decision of the Commissioner. *See Indoranto v. Barnhart,* 374 F.3d 470, 473 (7th Cir.2004).

Plaintiff argues that the ALJ's decision should be reversed and the matter remanded for a new hearing, consideration of evidence the ALJ skipped, and a consultative psychological exam. The Commissioner responds that the ALJ's decision is supported by substantial evidence and free of harmful legal error. The matter has been fully briefed and is ready for decision.

### I. APPLICABLE LEGAL STANDARDS

#### A. Disability Standard

In order to obtain benefits under the Social Security Act, plaintiff must be disabled, that is, she must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). She must show that her "impairments are of such severity that [s]he is not only unable to do h[er] previous work but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The Social Security Administration has adopted a sequential five-step test for determining whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520; 416.920. Under this test, the Commissioner must deter-

mine: (1) whether the claimant is presently engaged in substantial gainful activity ("SGA"); [1] (2) if so, whether the claimant has a severe impairment or combination of impairments; [2] (3) if so, whether any of the claimant's impairments are listed by the Administration as being so severe as to preclude substantial gainful activity; [3] (4) if not, whether the claimant possesses the residual functional capacity ("RFC") to perform her past work; [4] and (5) if not, whether the claimant is able to perform any other work in the national economy in light of her age, education and work experience. See, e.g., Young v. Barnhart, 362 F.3d 995, 1000 (7th Cir.2004).

The claimant will automatically be found disabled if she makes the requisite showing at steps one through three. If the claimant is unable to satisfy step three, she must then demonstrate that she lacks the RFC to perform her past work. If she makes this showing, the burden shifts to the Commissioner to establish that the claimant can engage in some other type of substantial gainful employment. The Commissioner may carry this burden either by relying on the testimony of a vocational expert ("VE"), who evaluates the claimant's ability to perform work in the national economy in light of her limitations, or through the use of the "Medical–Vocational Guidelines," (a.k.a. "the Grid"), 20 C.F.R. Pt. 404, Subpt. P, App. 2. The Grid is a chart that classifies a person as disabled or not disabled based on her exertional ability, age, education and work experience. However, the Commissioner may not rely on the Grid if the person's attributes do not correspond precisely to a particular rule, or if non-exertional limitations (e.g., pain, or mental, sensory or skin impairments) might substantially reduce the claimant's range of work. In such a case, the Commissioner must solicit the testimony of a VE, although she may use the Grid as a "framework" for making a decision. See, e.g., Worzalla v. Barnhart, 311 F.Supp.2d 782, 787 (E.D.Wis.2004).

## B. Standard of Review of ALJ's Decision

Under § 405(g), a district court may affirm, modify or reverse an ALJ's decision, with or without remanding the case for a rehearing. However, the court's review of the ALJ's decision is limited, and the ALJ's factual findings must be upheld if supported by substantial evidence. 42 U.S.C. § 405(g); Diaz v. Chater, 55 F.3d 300, 305 (7th Cir.1995). Substantial evidence is such evidence as a reasonable person would accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); Cannon v. Apfel, 213 F.3d 970, 974 (7th Cir.2000). In determining whether substantial evidence exists, the district court must take into account both evidence in support of a conclusion and anything that fairly detracts from its weight. Young v. Sec'y of Health & Human Servs., 957 F.2d 386, 388–89 (7th Cir.1992). The court must review all the evidence in the record, and such review "must be more than an uncritical rubber stamp." Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir.1984).

1. "Substantial" work activity involves doing significant physical or mental activities. "Gainful" work activity is work done for pay or profit. 20 C.F.R. § 404.1572.

2. An impairment is "severe" if it significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a).

3. These impairments are compiled in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (i.e. "the Listings").

4. RFC is an assessment of the claimant's ability to perform sustained work-related physical and mental activities in light of her impairments. SSR 96–8p.

■ Nevertheless, it is the ALJ who has the duty to weigh the evidence, resolve material conflicts, make independent findings of fact and determine the case accordingly. *See Richardson,* 402 U.S. at 399–400, 91 S.Ct. 1420. A reviewing federal court may not decide the facts anew, re-weigh the evidence or substitute its judgment for that of the ALJ. *Powers v. Apfel,* 207 F.3d 431, 434 (7th Cir.2000). Where conflicting evidence would allow reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the ALJ. *Binion on Behalf of Binion v. Chater,* 108 F.3d 780, 782 (7th Cir.1997).

■ If the ALJ commits an error of law, however, reversal is required without regard to the volume of evidence in support of the factual findings. *Id.; see also Pugh v. Bowen,* 870 F.2d 1271, 1274 (7th Cir.1989). The ALJ commits such an error if she fails to comply with the Commissioner's regulations and rulings. *See Prince v. Sullivan,* 933 F.2d 598, 602 (7th Cir.1991). The ALJ's decision must also demonstrate the path of her reasoning, and the evidence must lead logically to her conclusion. *Rohan v. Chater,* 98 F.3d 966, 971 (7th Cir.1996). While the ALJ need not discuss every piece of evidence in the record, she must provide at least a glimpse into her reasoning. *Zurawski v. Halter,* 245 F.3d 881, 889 (7th Cir.2001). Even if enough evidence exists in the record to support the decision, the court cannot uphold it if the reasons given by the ALJ do not build an accurate and logical bridge between the evidence and the result. *Hodes v. Apfel,* 61 F.Supp.2d 798, 806 (N.D.Ill.1999) (citing *Sarchet v. Chater,* 78 F.3d 305, 307 (1996)).

■ Finally, ALJs "must not succumb to the temptation to play doctor and make their own independent medical findings." *Rohan,* 98 F.3d at 970. "The medical expertise of the Social Security Administra-

tion is reflected in regulations; it is not the birthright of the lawyers who apply them." *Schmidt v. Sullivan,* 914 F.2d 117, 118 (7th Cir.1990).

## II. FACTS AND BACKGROUND

### A. Plaintiff's Application and Administrative Decisions

Plaintiff filed applications for benefits on July 23, 1999 (Tr. at 123) and January 6, 2000 (Tr. at 125). Both were denied (Tr. at 72 & 79, 74 & 84), and plaintiff did not request reconsideration or appeal. Plaintiff applied again on March 12, 2001 (Tr. at 127) and was again denied (Tr. at 76 & 88). This time she requested reconsideration (Tr. at 92, 172), but her request was denied on February 26, 2002 (Tr. at 94). On March 8, 2002, plaintiff requested a hearing (Tr. at 28, 98), and on February 10, 2003 she appeared before ALJ Margaret O'Grady (Tr. at 32, 103).

### B. The Hearing

Plaintiff, her son Stacy Sylvester, and VE Robert Verkins testified. (Tr. at 33.) Plaintiff was represented by counsel, who also appears on her behalf in this court. (Tr. at 32.) During an opening statement, counsel indicated that plaintiff would be alleging that depression and limited intellectual functioning were also components of her claim, and requested that the ALJ obtain a psychological evaluation with intelligence testing. (Tr. at 36.) The ALJ took the request under consideration, agreed to keep the record open for the provision of additional records missing from the file, then proceeded to take testimony. (Tr. at 36–37.)

#### 1. Plaintiff's Testimony

Plaintiff testified that her date of birth was April 5, 1955, that she was unmarried with two grown children, and lived by her-

self. (Tr. at 37.) She stated that she was 5′4″ tall and weighed around 200 pounds. (Tr. at 37–38.) She indicated that the highest grade she had completed in school was 11th and that she had not obtained a GED. (Tr. at 38.) She stated that she had attended North Division High School and did not do well: she was "slow," could not understand her assignments, and did not get her homework done. (Tr. at 52.) She testified that she could not remember if she had been in special education classes (Tr. at 52), although in pre-hearing submissions she had denied being in special education (Tr. at 151, 165). Plaintiff stated that she was able to read and write some words, but that her landlord helped her if she had to fill out any forms. (Tr. at 38.) She stated that she could not read a magazine or newspaper, although it was unclear whether this was due to illiteracy, poor vision or a combination of both. (Tr. at 38–39.) Plaintiff indicated that she did not have a driver's license because she could not pass the test; she had a license in the past, when she was 15, but only because someone helped her with the answers. (Tr. at 39.)

Plaintiff testified that she was not currently working and had not worked since a motor vehicle accident in February of 1999.[5] She stated that her last employment was as a prep cook at McDonald's from December 1998 to February 1999. She worked four to six hours per day, three or four days per week. (Tr. at 40.) However, she said that she had trouble with her duties, such as understanding which papers to use to wrap the sandwiches. (Tr. at 52.) She stated that she stopped working at McDonald's due to injuries sustained in the car accident. (Tr. at 41.)

From 1991 to 1995 or 1996, plaintiff did child care in her home for relatives, receiving $50 to $100 every two weeks. (Tr. at 41–42.) Her only other employment in the past 15 years was brief stints for temporary services. (Tr. at 42–43.) She testified that she had trouble understanding what to do on her assignments. (Tr. at 52.) She stated that she was financially supported by her children. (Tr. at 43.)

Plaintiff denied that she was currently receiving mental health treatment. (Tr. at 43.) However, she stated that she felt sad and that she had received psychological treatment in the past.[6] (Tr. at 53.) She said that she cried every day or every other day, and that she sat in her house in the dark every day. (Tr. at 54.) She testified that at times she wished she were dead. (Tr. at 55.)

Plaintiff indicated that she experienced constant pain in her neck and shoulder, for which she took medication and used a heating pad. (Tr. at 44.) In response to the ALJ's questioning, she denied side effects from the medication, except perhaps for urinary incontinence while she slept (Tr. at 46), but later indicated that her pills made her sleepy (Tr. at 55). She also complained of pain radiating down her left arm, and pain in her back three times per week. (Tr. at 45.)

Plaintiff testified that on a typical day she would go to her daughter's aunt's house to receive and make phone calls because she did not have a telephone. She testified that she did very little at home. She said that she did not clean, wash dishes or do laundry, and that she prepared food in the microwave. (Tr. at 47.) She stated that she dropped dishes and skillets when she tried to cook. (Tr. at

---

**5.** The medical records showed that the accident took place on March 2, 1999. (Tr. at 235.)

**6.** The hospital where plaintiff received that treatment was closed at the time of the hearing. (Tr. at 54.)

56.) She indicated that she was able to bathe herself but that her landlord or her son did her shopping for her. (Tr. at 47–48.) She stated that she watched television and denied any hobbies or social activities. (Tr. at 48–49.) She indicated that her son drove her to appointments. (Tr. at 49.)

Plaintiff stated that the farthest she could walk was three or four blocks, the longest she could stand was 10 minutes, the longest she could sit was 20 or 30 minutes, and the most she could lift was 10 pounds. (Tr. at 50.) She stated that she could bend and walk up stairs, though it made her tired. She said that she could use her right hand but lacked strength in the left. (Tr. at 50, 56.)

### 2. Stacy Sylvester's Testimony

Plaintiff's son testified that plaintiff lived alone and that he came to her house four or five times per week. (Tr. at 56–57.) He indicated that he paid her rent, bought food for her, helped out around the house and drove her to appointments. (Tr. at 57–58.) Sylvester said that his mother could cook little things and go to the bathroom by herself, but could not do major things around the house. He testified that she engaged in no social activities, aside from visiting him and their "Aunt Grace." (Tr. at 58.) Sylvester indicated that his mother liked to stay isolated in the house and that she seemed "slower" than other people. Her ability to communicate was "not on a regular level." (Tr. at 59.) He testified that when she took care of children for relatives she was taken advantage

of, receiving compensation of just $20 or $30 per week. (Tr. at 61.)

### 3. VE Verkins's Testimony

The VE testified that plaintiff's past work at McDonald's and doing child care was medium, semi-skilled work. Her temporary jobs were light, unskilled work. (Tr. at 63.) The ALJ then asked a series of hypothetical questions about a person 47 years old, with an 11th grade education and plaintiff's vocational history. If the person was limited to medium work exertionally,[7] able to occasionally perform climbing activities, and unable to perform above the shoulder work with the left arm, she could perform plaintiff's past work as a prep cook and childcare worker, as well as other positions in the economy such as light industrial assembler (20,000 positions in Wisconsin), light production inspector (2000 positions), light machine feeder (4000), light hand packager (6000), bench assembler (7200), sedentary production inspector (500), sedentary hand packager (700) and sedentary machine feeder (350). (Tr. at 63–64.) If the person needed a sit/stand option,[8] the sedentary jobs would remain but only 10% of the light jobs. (Tr. at 64.) The VE testified that these were all considered unskilled, simple, routine, repetitive non-complex jobs. (Tr. at 64.) If the person was capable of only limited contact with the public and limited interaction with co-workers the answer was the same. (Tr. at 64.)

The ALJ's second hypothetical involved a person who needed to avoid repetitive

---

7. Medium work is defined by the Administration as work that involves "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do ... light work." 20 C.F.R. § 404.1567(c).

8. "Some individuals must, due to their impairments, go regularly from a seated to a standing position and vice versa. If the need to change positions cannot be 'accommodated by scheduled breaks and a lunch period,' SSR 96–9p, the person needs a so-called 'sit/stand option,' i.e. the freedom to change positions as necessary." *Brown v. Barnhart,* 298 F.Supp.2d 773, 782 n. 5 (E.D.Wis.2004).

bending and twisting; avoid kneeling, crawling, squatting and climbing; avoid repetitive use of the left shoulder and over the shoulder reaching with the left arm; and could lift a maximum of 25 pounds. The VE testified that such a person could not do plaintiff's past work (Tr. at 64), but could work as a hotel clerk (17,000 in Wisconsin), security guard (4000), counter rental clerk (2100) or telephone operator (1400). (Tr. at 65.) However, the VE testified that if plaintiff's limited academic skills were taken into account, the jobs referred to in response to the second hypothetical would be eliminated. (Tr. at 66–67.) He further testified that some of these jobs—such as security guard—were semi-skilled. (Tr. at 67.)

The VE stated that he used the U.S. Publishing's most recent quarterly report in providing job numbers. (Tr. at 68.) He said that he took the census codes from these jobs, and then applied his experience and education to make educated guesses about what the remaining occupational bases might be. (Tr. at 69.)

## C. Medical Evidence

### 1. Treating Sources

Plaintiff was seen at the Sinai Samaritan Hospital emergency room on July 30, 1998, complaining of sinus pressure and a runny nose. She was discharged and told to drink fluids and use an inhaler as needed. (Tr. at 427–34.) Plaintiff was seen again at Sinai on December 21, 1998, complaining of an upper respiratory infection. She was provided with medication and discharged home. (Tr. at 419–26.) Plaintiff was next seen at the Sinai ER on or about February 13, 1999 complaining of epigastric pain, nausea and diarrhea for several days. (Tr. at 225, 244–46.) She was diag-

nosed with trichomonos, ileus and gastroenteritis. (Tr. at 254; 411–18.)

On March 2, 1999 plaintiff was involved in a motor vehicle accident and was seen at Sinai Samaritan the following day. (Tr. at 235–36.) Plaintiff advised that she was an unrestrained front seat passenger in a vehicle which was struck on the driver's side. She indicated that the driver of her vehicle had been pushed into her, and she complained of pain in the neck, back and left arm. (Tr. at 236–37.) An x-ray of plaintiff's left humerus revealed no fractures. (Tr. at 224, 299.) She was provided with ibuprofen for pain and told to follow up at the "MLK Clinic" for any continued pain.[9] (Tr. at 242, 298; 404–10.)

On March 8, 1999, plaintiff began treating with Dr. Flowers. (Tr. at 276.) At that time, she was continuing to experience neck, back, knee and shoulder pain. (Tr. at 277.) Dr. Flowers's initial diagnoses were contusion to the left knee, contusion to the abdomen, contusion to the left shoulder/elbow, acute neck strain, acute stress reaction and acute low back strain. (Tr. at 278–79.) Plaintiff was started on therapy, including hot packs and ultrasound. She was also shown neck, shoulder and arm exercises. She was advised to use over the counter analgesics. (Tr. at 279.)

Plaintiff returned to Dr. Flowers on March 24 and was released from work until April 6. (Tr. at 296.) She was continued on thrice weekly therapy. (Tr. at 296.) Plaintiff was next seen by Dr. Flowers on April 6, and released from work until April 20. She was again continued on thrice weekly therapy. (Tr. at 270, 313.) On April 9, because of persistent pain, x-rays were taken of plaintiff's left shoulder, left knee and LS-spine, which

---

9. It appears that the MLK Clinic is a community facility which provides service to low income persons. (Tr. at 243.)

were normal. (Tr. at 280, 294.) On April 21, plaintiff was continued off work until May 12, and her therapy was continued. (Tr. at 269, 312.) Plaintiff returned to Dr. Flowers on May 14, was continued off work until June 14, and her therapy was reduced to twice weekly. (Tr. at 268, 315.) On May 24, due to persistent left knee problems (Tr. at 311), an MRI was performed, which revealed an extensive subchondral cyst formation in the patella, consistent with degenerative change, some degenerative signal from the mid portion of the medial meniscus, and degenerative tear of the superior surface near the middle of the medial meniscus. (Tr. at 267, 280, 307, 309.)

On June 10, Dr. Flowers continued plaintiff off work until July 14. (Tr. at 308.) He also referred her to Dr. Weidman, an orthopedist, for a consult.[10] (Tr. at 306, 308, 314.) Her physical therapy was discontinued. (Tr. at 314.) Dr. Flowers had provided plaintiff with soft tissue therapy, infrared heat, ultrasound, mechanical massage, hot packs, vibration therapy, HILLS table, and various other therapy modalities. (Tr. at 280–81; *see also* Tr. at 285–93, 295, 300–05.) With this treatment, Dr. Flowers reported that plaintiff had some relief and improvement in her range of motion, but did not fully recover and ended up with some permanent problems. (Tr. at 282.) Dr. Flowers reported that plaintiff did not return to work and that she felt unable to return. (Tr. at 282.) At the time of plaintiff's final visit on July 7, 1999, she was still complaining of pain in her left knee, left shoulder and other areas. Plaintiff stated that she was at only 40% of her normal activities. (Tr. at 282.) She was discharged from care with Dr. Flowers with the following permanent restrictions:

1. avoid repetitive bending and twisting of the back;

2. avoid kneeling, crawling, squatting or climbing;

3. maximal lifting of 25 pounds;

4. avoid repetitive use of the left shoulder; and

5. avoid over-the-shoulder reaching with the left upper extremity.

(Tr. at 283–84.) Dr. Flowers opined that plaintiff would need future medical care, including orthopedic evaluation of the left knee and shoulder and possible surgical correction. (Tr. at 284.)

Plaintiff returned to Sinai Samaritan on or about July 12, 1999 complaining of left trapezius pain. She was told to continue medication as directed and follow up at the MLK Clinic. (Tr. at 226, 228, 233, 397–403.)

On July 22, plaintiff began receiving treatment from Dr. Nwilati at the Sethi Medical Clinic,[11] complaining of left arm pain, left side lower back pain and left knee pain. (Tr. at 265–66.) Plaintiff indicated that she had been released from treatment for the March 2, 1999 accident but was still experiencing pain in the shoulder and back. (Tr. at 262.) Dr. Nwilati provided Celebrex for pain. (Tr. at 262.)

Plaintiff returned to Dr. Nwilati on August 16, still complaining of low back, left shoulder and left knee pain. Plaintiff was advised to continue physical therapy prescribed by a doctor assigned by her lawyer.[12] (Tr. at 259.) Plaintiff returned on

---

10. The record indicates that plaintiff did not see Dr. Weidman until November 1999, when she was referred to him by Dr. Nwilati. (Tr. at 334.)

11. As was discussed at plaintiff's hearing before the ALJ (Tr. at 34–35), it appears that one of the records from the Sethi Clinic does not pertain to plaintiff although it bears her name at the top. (Tr. at 257.)

12. It is unclear from the record who this doctor was.

September 20 and October 22, continuing to complain of shoulder and knee pain. She was prescribed Vioxx and Ultram. (Tr. at 258.)

In November 1999, plaintiff was referred by Dr. Nwilati to Dr. Weidman at Northwest General Hospital regarding her left knee and left shoulder injuries. (Tr. at 334.) On examination by Dr. Weidman, plaintiff had full active range of motion of the shoulder but a painful arc at 90 degrees and a snapping sensation when she raised it above that level. Her knee had flexion/extension of 0–130 degrees. Dr. Weidman ordered an x-ray (Tr. at 334), which revealed a narrowing of the medial joint space, consistent with early degenerative joint disease of the medial compartment (Tr. at 333).

Dr. Weidman performed surgery on plaintiff's left knee on December 9, 1999. (Tr. at 325–26, 328–29.) His pre-operative diagnosis was post-traumatic degenerative arthritis of the patellofemoral joint and anterior cruciate ligament laxity. His post-operative diagnosis was post-traumatic grade 4 chondromalacia of the medial facet of the patella, post-traumatic ACL laxity and a tear of the posterior horn of the lateral meniscus. (Tr. at 325.)

The medical records then skip to October 20, 2000, when plaintiff was referred by Dr. Weidman to Dr. Zussman for EMG nerve conduction studies to rule out radiculopathy and/or carpal tunnel syndrome. (Tr. at 272, 274.) Plaintiff had been complaining of left shoulder girdle pain with numbness and tingling in the left hand. She also complained of severe discomfort in the trapezius. However, she denied any true radicular pain from the neck to the hand. (Tr. at 272.) The nerve conduction study was essentially normal and the EMG unremarkable. Dr. Zussman's impression was probable reflex sympathetic dystrophy and myofascial pain syndrome of the left shoulder girdle. (Tr. at 273). Dr. Zuss-

man recommended a bone scan to rule out reflex sympathetic dystrophy, appropriate nerve blocks, treatment of mysofascial pain syndrome with appropriate trigger point injections, and appropriate low levels of non-steroidals. (Tr. at 273.)

On November 1, 2000, plaintiff returned to Dr. Nwilati at the Sethi Clinic, complaining of body ache and too much urination. She also complained of left shoulder pain and left hand numbness. (Tr. at 356–57.) On December 1, plaintiff again saw Dr. Nwilati, complaining of continued left shoulder pain and hand numbness. (Tr. at 354.) Dr. Nwilati referred her back to Dr. Weidman. (Tr. at 355.)

On January 10, 2001, plaintiff was seen by Dr. Nwilati at the Sethi Clinic, still complaining of severe left shoulder pain and an upper respiratory infection. She had apparently been unable to see Dr. Weidman, so another referral and a refill of Darvocet was provided. (Tr. at 352–53.)

On January 18, plaintiff was seen by Dr. Simon at Sinai Samaritan. Plaintiff indicated that she had been receiving treatment at Northwest General Hospital. At that time, it was believed that she had carpal tunnel syndrome or cervical radiculopathy. The doctor also believed there were early signs of reflex sympathetic distrophy as well as myofascial pain syndrome of the left shoulder. On exam, plaintiff was globally tender about the shoulder. Dr. Simon decided to obtain a bone scan and consider trigger point injections. (Tr. at 211.)

On January 24, plaintiff underwent a bone scan of her left shoulder at Sinai, which revealed no abnormality or evidence of reflex sympathetic dystrophy. (Tr. at 212, 455.) On February 1, plaintiff saw Dr. Weidman regarding the bone scan, and he opined that plaintiff's condition was post-traumatic myofascial pain syndrome. (Tr. at 216.) On February 2, plaintiff saw Dr. Nwilati for a check up. (Tr. at 350.)

On March 1, 2001, plaintiff saw Dr. Weidman, who noted that plaintiff continued to have shoulder pain, with a snapping in the acromial space. He indicated that she had undergone three injections in the subacromial space, each of which provided about two weeks of relief. He noted that a March 30, 2000 MRI of the shoulder indicated essentially normal anatomy. He opined that she had signs and symptoms of impingement syndrome, which had been only partially responsive to injections and physical therapy. He indicated that plaintiff may want to consider arthroscopic acromioplasty to decrease her discomfort. He noted that plaintiff also had tenderness over the scapular wing, with additional signs of fibromyalgia-like symptoms. However, he noted that she had no additional trigger points supporting a diagnosis of fibromyalgia. He noted that she had some paresthesias radiating down the dorsum of the hand but a work up by her physicians revealed no evidence of entrapment neuropathy in the neck. (Tr. at 210, 453.)[13]

On April 11, Dr. Weidman performed the acromioplasty surgery on plaintiff's left shoulder. (Tr. at 213, 275.) His pre-operative diagnosis was impingement syndrome with chronic bursitis, and his post-operative diagnosis was chronic bursitis, left shoulder, with impingement, and early glenohumeral degenerative arthritis. (Tr. at 213, 451.) Plaintiff saw Dr. Weidman in follow up on April 19, and he started her on therapy to improve motion and relieve pain. (Tr. at 209.) Plaintiff returned on May 17 and her motion was improving nicely. She complained of some difficulty breathing, so the doctor obtained a chest x-ray (Tr. at 207, 448), which revealed a possible lung nodule (Tr. at 208, 449). Plaintiff was continued on her stretching regimen. (Tr. at 207, 448.)

On June 18, plaintiff saw Dr. Nwilati complaining of blurred vision. (Tr. at 347.) Dr. Nwilati noted that plaintiff had been depressed for the past few months. (Tr. at 347.) He suggested that she see a psychiatrist. (Tr. at 348.)

Plaintiff saw Dr. Weidman on June 21 and was noted to have increased flexion/abduction of the left shoulder and significant improvement in pain. Plaintiff stated that while she definitely felt improved from her pre-surgical state, she continued to have discomfort. Dr. Weidman assessed her with 4% permanent partial disability to the left shoulder. Her left knee had recovered nicely. She was released from medical care by Dr. Weidman. (Tr. at 202, 447.)

Plaintiff saw Dr. Nwilati for a check up on August 22, and indicated that she was still experiencing shoulder and knee pain. She was continued on pain medication. (Tr. at 345–46.) Plaintiff returned to Dr. Nwilati on October 19, complaining of a cold and trouble when going to the bathroom. (Tr. at 343.)

On January 10, 2002, plaintiff returned to Dr. Weidman with recurrent and persistent left shoulder discomfort. Dr. Weidman noted that plaintiff was improved since her surgery but had not obtained complete relief. She was referred for therapy and advised to use anti-inflammatory medication. (Tr. at 445.)

On March 21, plaintiff returned to Dr. Weidman with persistent left shoulder pain. Dr. Weidman noted that she had

13. Plaintiff sought assistance from the Wisconsin Department of Vocational Rehabilitation (DVR) in early 2001, and on March 1, 2001, her doctor opined that she was "not ready" for work. (Tr. at 359.) The doctor's signature on the DVR form is illegible, but based on the listed diagnosis—impingement syndrome of the left shoulder—and the date of the report—the same day plaintiff saw Dr. Weidman—it appears that Weidman completed the form. (Tr. at 358.)

full range of motion. She also complained of continued pain in the left neck with distal radiation to the hand and diminished grip strength. She also complained of trouble with her knee. Dr. Weidman was concerned that she may have cervical radiculopathy and myelopathy, and ordered an MRI of the cervical spine and x-rays of the left shoulder. (Tr. at 443.)

The MRI was completed on April 18, and revealed disc space narrowing, mild cervical spondylosis and disc bulges at C3–C4, C4–C5, and C5–C6. There was narrowing of the thecal sac at this level. There was also a disc protrusion at C6–C7 causing narrowing of the thecal sac. There was no cord compression. There was also a prominent spur involving the C3–C4 neural foramen on the right. (Tr. at 441–42.)

Plaintiff returned to Dr. Weidman on June 13, complaining of continued pain in the neck. Motion of the neck was full, but uncomfortable. Her left hand grip was somewhat diminished compared to the right. Dr. Weidman reviewed the shoulder x-rays, which showed degenerative changes at the AC joint, and the MRI results. He ordered electro-diagnostic studies concerning her left hand weakness. Dr. Weidman also noted that plaintiff had applied for SSI, "which may be an overriding factor in the case." (Tr. at 439.)

Plaintiff returned to Dr. Weidman on July 25, after having an EMG study performed by Dr. Zussman. Her concern was that the doctor fill out paperwork for the SSI application. On examination, she had multiple trigger points over the left shoulder only and was tender in the neck on that side. However, she had excellent range of motion. Dr. Weidman decided that plaintiff should be seen by a pain management specialist, Dr. Howards. (Tr. at 437.)

On August 3, plaintiff visited Sinai complaining of shortness of breath and chest wall pain. Various tests were performed, and plaintiff was provided prescription ibuprofen and told to follow up with Dr. Nwilati. (Tr. at 378–96.)

On September 3, plaintiff saw Dr. Howards, who performed a C6–C7 epidural nerve block. Plaintiff gradually developed relief of her symptoms and was advised to call for follow-up care as necessary. (Tr. at 435.)

Plaintiff went to Sinai Samaritan on January 24, 2003, seeking a refill of her medication. She complained of chronic neck pain and urinary incontinence. (Tr. at 375.) She indicated that she had no insurance and asked for medication samples. She was told to re-establish her GAMP, follow up with Dr. Nwilati and Dr. Howards, and was provided with Flexeril. (Tr. at 367–76.)

## 2. Consulting Sources

On September 7, 1999, Dr. Callear completed an RFC assessment for the Administration. (Tr. at 316.) He opined that plaintiff could lift 50 pounds occasionally, 25 pounds frequently; stand/walk six out of eight hours; sit about six out of eight hours; and was limited in the ability to push/pull with the upper extremities. (Tr. at 317.) He found that plaintiff could occasionally climb, and frequently balance, kneel, crouch and crawl. (Tr. at 318.) He opined that her ability to perform repetitive above shoulder activity with the left arm was limited but that her handling and fingering abilities were unlimited. (Tr. at 319.)

On February 25, 2000 another state agency consultant (whose name is illegible) completed an RFC assessment. The reviewer discussed plaintiff's symptoms and knee surgery but provided no opinion on plaintiff's limitations. (Tr. at 335–42.)

**D. ALJ's Decision**

On September 16, 2003, the ALJ issued a decision denying plaintiff's application. (Tr. at 11.) The ALJ followed the sequential five step evaluation process. First, the ALJ concluded that plaintiff had not engaged in SGA since March 12, 2001 (the date of her application), or at any time in the last 15 years. (Tr. at 15, 21 # 1.) At step two, the ALJ determined that plaintiff's depression was non-severe, that any mental limitations were mild, and declined to order intelligence testing as requested by counsel at the hearing. (Tr. at 16, 19.) She noted that plaintiff had received no psychiatric care, and that plaintiff had indicated in several exhibits that she was not in special education classes at school. (Tr. at 20.) The ALJ concluded that plaintiff did suffer from severe physical impairments: left shoulder impingement, degenerative disc disease, cervical radiculopathy (C6–7), degenerative joint disease, myofascial pain syndrome, herniated disc, left shoulder bursitis, arthritis and chondromalacia. (Tr. at 19.) However, the ALJ determined at step three that none of these impairments met or equaled a listed impairment. (Tr. at 19, 21 # 2.)

At step four, the ALJ concluded that plaintiff retained the RFC to perform light work,[14] which would require no kneeling, crawling, squatting or climbing, and no repetitive twisting and bending of the back, no repetitive use of the left shoulder and no above-shoulder work with the left arm. (Tr. at 19, 21 # 4.) In making this determination, the ALJ considered plaintiff's testimony of debilitating pain but concluded that it was not consistent with the evidence of record. (Tr. at 19, 21 # 3.) Given this RFC, the ALJ determined that plaintiff could not perform her past work,

which in any event was not considered vocationally relevant as plaintiff had not engaged in SGA in the past 15 years. (Tr. at 20, 21 # 5.)

Finally, at step five, relying on the testimony of the VE and using Grid Rule 202.17 as a framework, the ALJ concluded that plaintiff was able to perform a significant number of other jobs in the economy. (Tr. at 20–21.) Accordingly, she concluded that plaintiff was not disabled at any time through the date of her decision. (Tr. at 21.)

**E. Appeals Council Review and District Court Action**

On September 18, 2003, plaintiff filed a request for review of the ALJ's decision by the Appeals Council, along with a copy of a post-hearing submission filed on March 12, 2003. (Tr. at 10, 463–65.) It appears that the ALJ either did not receive or did not consider this submission, although it bears the date stamp of the Office of Hearings and Appeals. (Tr. at 466.)

In that submission, plaintiff again requested a psychological evaluation to assess her low intellectual functioning and depression. Plaintiff included a high school transcript showing that she received mostly "D"s and "U"s in school, and took a "reading improvement" class. (Tr. at 466, 471.) Plaintiff also objected to the VE's testimony, arguing that his opinion was unreliable. She stated that the source relied upon by the VE did not report how many individuals were employed in specific DOT jobs within a particular census code; rather, it arbitrarily assigned a certain percentage to each. (Tr. at 466–67, 472.)

However, on December 20, 2003, the Council denied plaintiff's request for re-

---

**14.** "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). I note

that the ALJ's second hypothetical to the VE, the answer to which she relied upon at step 5, included a lifting limitation of 25 pounds, which is beyond "light work."

view. (Tr. at 5.) The Council received the additional evidence submitted by plaintiff but concluded that it did not provide a basis for changing the ALJ's decision. (Tr. at 5, 8.) This action followed.

Before this court, plaintiff argues that (1) the ALJ improperly evaluated her mental impairment by failing to procure a psychological consultation and ignoring the evidence submitted post-hearing; (2) the ALJ's credibility determination was flawed; and (3) the ALJ's finding at step 5 was not supported by substantial evidence because the VE's testimony was unreliable.

I conclude that the ALJ failed to properly evaluate plaintiff's alleged mental impairment, and that the lack of a consultative examination precluded an informed decision on plaintiff's claim. In considering plaintiff's alleged mental impairment, the ALJ also failed to properly evaluate plaintiff's credibility and ignored important evidence. Because the credibility issue is intertwined with the mental impairment issue, my analysis of it will be subsumed within that of the mental impairment issue. Finally, I conclude that because the matter must be remanded plaintiff may present her argument regarding the reliability of the VE's figures to the ALJ at the hearing on remand.

## III. EVALUATION OF PLAINTIFF'S MENTAL IMPAIRMENT

### A. Applicable Standard Regarding Development of the Record and Ordering Consultative Examination

■ A social security claimant bears the burden of supplying adequate records and evidence to prove her claim of disability. *Scheck v. Barnhart,* 357 F.3d 697, 702 (7th Cir.2004). However, because disability proceedings are non-adversarial, the ALJ also has a duty to ensure that the record is fully and fairly developed, even when the claimant is represented by counsel. *See*

*Hawkins v. Chater,* 113 F.3d 1162, 1164, 1168 (10th Cir.1997); *Luna v. Massanari,* No. 00–1075, 2001 WL 987860, *6, 2001 U.S. Dist. LEXIS 13117, at *18 (S.D.Ind. July 18, 2001). This may require the ALJ to consult medical advisors or order a consultative medical or psychological examination. *See Flener v. Barnhart,* 361 F.3d 442, 448 (7th Cir.2004); *see also Sanchez v. Apfel,* No. 99–2236, 2000 WL 376616, *3, 2000 U.S.App. LEXIS 6769, at *8 (10th Cir. Apr. 13, 2000) (stating that although it is the claimant's burden to prove she is disabled, the ALJ must ensure the development of an adequate record, which may require the ALJ to order a consultative examination). Nevertheless, because the primary responsibility for producing medical evidence demonstrating the severity of impairments remains with the claimant, and "because it is always possible to identify one more test or examination an ALJ might have sought, the ALJ's reasoned judgment of how much evidence to gather should generally be respected." *Flener,* 361 F.3d at 448 (internal citation omitted); *see also Griffith v. Callahan,* 138 F.3d 1150, 1154 (7th Cir.1998), *overruled on other grounds by Johnson v. Apfel,* 189 F.3d 561 (7th Cir.1999).

■ The claimant cannot force the purchase of a consultative examination with her own bald claim of psychological problems. *See, e.g., Kendrick v. Shalala,* 998 F.2d 455, 458 (7th Cir.1993); *Howell v. Sullivan,* 950 F.2d 343, 349 (7th Cir.1991); *Wych v. Barnhart,* No. 02–C–2818, 2003 WL 21654251, *8, 2003 U.S. Dist. LEXIS 11892, at *22 (N.D.Ill. July 10, 2003). However, if the claimant presents evidence sufficient to suggest "a reasonable possibility that a severe impairment exists," it then "becomes the responsibility of the ALJ to order a consultative examination if such an examination is necessary or helpful to resolve the issue of impairment."

*Hawkins,* 113 F.3d at 1167; *see also Moreno v. Barnhart,* No. 02–CA–1126, 2003 WL 22244971, *3, 2003 U.S. Dist. LEXIS 17129, at *7 (W.D.Tex. Sept. 2, 2003) (quoting *Haywood v. Sullivan,* 888 F.2d 1463 (5th Cir.1989)) (stating that a consultative exam may be required when the claimant " 'raises the requisite suspicion' that such an examination is necessary for the ALJ to discharge his duty of full inquiry"). Indeed, it is reversible error not to order a consultative examination when such an evaluation is necessary for an informed decision. *Harris v. Apfel,* No. 98–0953, 1999 U.S. Dist. LEXIS 16944, at *12 (S.D.Ala. Oct. 14, 1999) (citing *Reeves v. Heckler,* 734 F.2d 519, 522 n. 1 (11th Cir.1984)); *see also Birnell v. Apfel,* 45 F.Supp.2d 826, 835 (D.Kan.1999) (stating that the pertinent inquiry is whether the record contained sufficient information for the ALJ to make an informed decision as to the claimant's alleged mental impairment without the need for a consultative psychological exam).

██ When the claimant is represented by counsel at the administrative hearing, the ALJ is ordinarily entitled to rely on counsel to identify the issues that require further development. In the absence of a request by counsel, the ALJ must order an examination only when the need for one is clearly established in the record. *Hawkins,* 113 F.3d at 1167–68; *see also Falk v. Commissioner of Social Security, Barnhart,* 282 F.Supp.2d 1206, 1213 (D.Kan. 2003) (finding that ALJ did not err in declining to order psychological exam where plaintiff's counsel failed to ask for one and plaintiff had previously denied disabling depression). However, when counsel clearly raises the issue, the court may more critically review the ALJ's failure to order an examination. *See Hawkins,* 113 F.3d at 1168–69.

The Commissioner has enacted regulations to guide ALJs in determining whether to order such an examination. For instance, 20 C.F.R. § 416.919a provides:

(a)(1) General. The decision to purchase a consultative examination for you will be made after we have given full consideration to whether the additional information needed (e.g., clinical findings, laboratory tests, diagnosis, and prognosis) is readily available from the records of your medical sources. See § 416.912 for the procedures we will follow to obtain evidence from your medical sources. Before purchasing a consultative examination, we will consider not only existing medical reports, but also the disability interview form containing your allegations as well as other pertinent evidence in your file.

(2) When we purchase a consultative examination, we will use the report from the consultative examination to try to resolve a conflict or ambiguity if one exists. We will also use a consultative examination to secure needed medical evidence the file does not contain such as clinical findings, laboratory tests, a diagnosis or prognosis necessary for decision.

(b) Situations requiring a consultative examination. A consultative examination may be purchased when the evidence as a whole, both medical and nonmedical, is not sufficient to support a decision on your claim. Other situations, including but not limited to the situations listed below, will normally require a consultative examination:

(1) The additional evidence needed is not contained in the records of your medical sources;

(2) The evidence that may have been available from your treating or other medical sources cannot be obtained for reasons beyond your control, such as death or noncooperation of a medical source;

(3) Highly technical or specialized medical evidence that we need is not available from your treating or other medical sources;

(4) A conflict, inconsistency, ambiguity or insufficiency in the evidence must be resolved, and we are unable to do so by recontacting your medical source; or;

(5) There is an indication of a change in your condition that is likely to affect your ability to work, or, if you are a child, your functioning, but the current severity of your impairment is not established.

Further, SSR 96–7p provides:

The adjudicator must develop evidence regarding the possibility of a medically determinable mental impairment when the record contains information to suggest that such an impairment exists, and the individual alleges pain or other symptoms, but the medical signs and laboratory findings do not substantiate any physical impairment(s) capable of producing the pain or other symptoms.

*See also* 20 C.F.R. § 404.1527(c)(3) (stating that if after weighing the evidence the SSA cannot reach a conclusion about whether the claimant is disabled, the SSA may ask the claimant to undergo a consultative examination at its expense); *Birnell,* 45 F.Supp.2d at 837 (finding that 42 U.S.C. § 421(h), which indicates that where there is evidence indicating the existence of a mental impairment the Commissioner must make every reasonable effort to ensure that a qualified psychiatrist or psychologist has reviewed the case, may require ALJ to order examination).

**B. Plaintiff's Claim**

██ In the present case, plaintiff did not allege any mental disability in her application. (*See* Tr. at 158–67.) However, at the hearing her attorney advised the ALJ that depression and limited intellectual functioning were components of her claim. Counsel therefore asked the ALJ

to obtain a psychological evaluation with intelligence testing. (Tr. at 36.) The ALJ took the request under advisement. (Tr. at 37.)

At the hearing, plaintiff presented information suggesting the existence of a mental component to her claim. First, she submitted a treatment note from Dr. Nwilati indicating that she had felt depressed for a few months, that she used to see a psychiatrist, and containing a recommendation that she do so again. (Tr. at 347–48.) Second, plaintiff testified that she had only completed the 11th grade; was "slow" in school and did not understand her assignments; did not read or write well; did not have a driver's license because she could not pass the test; had trouble understanding how to wrap the sandwiches when she worked at McDonald's and how to cut boxes at one of her temporary assignments; paid her bills in cash, with her landlord's help, and never had a checking account; had seen a psychiatrist in the past; cried every day or every other day, and wished she was dead; and sat alone in her house in the dark every day. (Tr. at 38–39, 52–54.) Third, plaintiff's son testified that plaintiff liked to stay isolated in the house, was slower than other people, and did not communicate "on a regular level." (Tr. at 59.) Fourth, she submitted (post-hearing, but before the record closed) a high school transcript, which indicated that her grades were relatively poor. (Tr. at 471.)

Plaintiff contends that the ALJ erred in evaluating her alleged mental impairment by failing to obtain a consultative psychological evaluation and ignoring (or losing) the additional information she submitted after the hearing but before the record closed. She also contends that the ALJ erred in rejecting her and her son's testimony concerning this issue.

In rejecting plaintiff's claim, the ALJ wrote:

> [Claimant] continues to socialize with family members. She makes her appointments and goes to a corner store alone. She can take public transportation to appointments. Claimant lives on her own. Claimant has poor work history. . . .
>
> . . . Claimant answered in three exhibits that she completed the 11th grade and was not in special education. Claimant mentioned depression at one doctor's visit. She has not had any psychiatric care and no psychiatric medications have been prescribed. I find depression is non-severe and no basis for ordering intelligence testing as [claimant's] attorney requested. Claimant's B and C criteria mental limits are mild for social functioning, restrictions of activities of daily living, concentration and she has no episode of decompensation.[15]
>
> Therefore, based upon these factors, it is determined that claimant's subjective allegations about the disabling nature of her impairments are not reasonably consistent with the evidence of record and do not correspond with the level of treatment she has required or the information provided about her level of activity and ability. Accordingly, there is no basis for finding that she suffers debilitating pain or any symptoms which would further reduce [her RFC].

(Tr. at 19–20.)

The ALJ erred in evaluating plaintiff's mental impairment. First, the reasons provided by the ALJ, including her rejection of plaintiff's testimony, do not withstand scrutiny. Second, the ALJ ignored important evidence—the transcript presented post-hearing and the testimony of plaintiff's son. Third, based on the VE's testimony, it is clear that the absence of a consultative examination prevented an informed decision on plaintiff's claim.

### 1. ALJ's Reasons for Rejecting Plaintiff's Claim of Mental Impairment and Request for Psychological Evaluation

#### a. Plaintiff's Credibility

#### 1. Credibility Standard

 Generally, the court must defer to the ALJ's credibility determination because she had the opportunity to personally observe the claimant's demeanor at the hearing. *Brown*, 298 F.Supp.2d at 793. Thus, the court will ordinarily reverse an ALJ's credibility determination only if it is "patently wrong." *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir.2003). "However, when such determinations rest on objective factors or fundamental implausibilities rather than subjective considerations, appellate courts have greater freedom to review the ALJ's decision." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir.1994). Further, the court need not defer to a credibility determination based on a misunderstanding or one-sided view of the evidence. *See Sarchet*, 78 F.3d at 307–08. Finally, the ALJ must comply with SSR 96–7p in evaluating credibility. *Lopez v. Barnhart*, 336 F.3d 535, 539–40

---

**15.** Earlier in her decision, the ALJ similarly wrote: "It is noted that claimant alleged limited intellect and psychiatric problems at this hearing. Claimant answered in 3 exhibits that she completed the 11th grade and was not in special education. Claimant mentioned depression at one doctor's visit. She has not had any psychiatric care and no psychiatric medications have been prescribed. I find depression is non-severe. I also find no basis for ordering intelligence testing as attorney requested. Claimant has worked with the Department of Vocational Rehabilitation. No mental limitations were alleged or noted during her involvement with DVR in 2001. I find no basis for finding significant intellectual or psychiatric limitations." (Tr. at 16.)

(7th Cir.2003); *Brindisi v. Barnhart,* 315 F.3d 783, 787 (7th Cir.2003).

SSR 96–7p provides, in pertinent part:

In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record. An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.

SSR 96–7p.

Under SSR 96–7p, the relevant considerations include:

1. The individual's daily activities;

2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

While SSR 96–7p does not require an ALJ to analyze and elaborate on each of the seven factors set forth when making a credibility determination, the ALJ must sufficiently articulate her assessment of the evidence to assure the court that she considered the important evidence and to enable the court to trace the path of her reasoning. *Lechner v. Barnhart,* 321 F.Supp.2d 1015, 1030 (E.D.Wis.2004).

Finally,

The finding on the credibility of the individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility. The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight. This documentation is necessary in order to give the individual a full and fair review of his or her claim, and in order to ensure a well-reasoned determination or decision.

SSR 96–7p; *see also Golembiewski v. Barnhart,* 322 F.3d 912, 916 (7th Cir.2003) (stating that "nothing in Social Security Ruling 96–7p suggests that the reasons for a credibility finding may be implied" and that "general principles of administrative law preclude the Commissioner's lawyers

from advancing grounds in support of the agency's decision that were not given by the ALJ"); *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir.2002) ("Without an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed.").

### ii. ALJ's Evaluation in the Present Case

In the present case, the ALJ rejected plaintiff's testimony as to her limited mental functioning, depression and disabling pain. In so doing, she relied primarily on her finding that plaintiff was able to continue performing numerous activities of daily living within normal limits despite her alleged impairments. The ALJ stated that plaintiff socializes with family members, makes her appointments and goes to the corner store alone, can take public transportation, and lives on her own. (Tr. at 20.)

The ALJ's list of activities was either unsupported by the record, or consisted of the sort of minimal daily activities that are consistent with inability to work full-time:

- **Plaintiff socializes with family members.** Plaintiff testified that she went to her "daughter's auntie's house" to make and receive phone calls every other day. (Tr. at 47.) Aside from that, she testified that she participated in no hobbies or social activities and kept to herself, often sitting alone in her house with the lights off. (Tr. at 48–49.) Plaintiff's son corroborated her testimony, testifying that while plaintiff visited him and "Aunt Grace" (Tr. at 58), she "likes to stay isolated in the house a lot." (Tr. at 59.) Thus, the record did not support the ALJ's contention. In any

event, one can be disabled and yet get together with family or friends from time to time. *See Mason v. Barnhart*, 325 F.Supp.2d 885, 904 (E.D.Wis.2004) (citing *Carradine v. Barnhart*, 360 F.3d 751, 756 (7th Cir.2004)).[16]

- **Plaintiff makes her appointments and goes to a corner store alone.** Plaintiff testified that her landlord or her son did her grocery shopping for her,[17] but that she could go to the corner store by herself to "buy a soda." (Tr. at 48.) It is difficult to see how the ability to walk one block and purchase a can of soda is consistent with the ability to work full time. *See, e.g., Carradine*, 360 F.3d at 756 (stating that ability to shop with assistance and perform other minimal activities was not inconsistent with claim of disabling pain); *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir.2000) (rejecting ALJ's reliance on plaintiff's ability to go grocery shopping about three times a month and sometimes carry groceries from the car to the apartment); *Brennan–Kenyon v. Barnhart*, 252 F.Supp.2d 681, 698–99 (N.D.Ill.2003) (rejecting ALJ's credibility determination where, although plaintiff could cook, do light household chores and shop, she otherwise stayed at home, because plaintiff's activities were fairly restricted and not the kind of activities that necessarily undermine or contradict a claim of disabling impairments). It is also difficult to see how the ability to make it to a doctor's appointment undermines a claim of disability.

- **Plaintiff can take public transportation to appointments.** The ability to use public transportation is a factor the ALJ considers in evaluating an alleged

---

**16.** The Third Circuit once memorably wrote: "Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity." *Smith v. Califano*, 637 F.2d 968, 971 (3d

Cir.1981). If plaintiff and her son are to be believed, that is often what plaintiff does.

**17.** Plaintiff's son again corroborated her testimony on this issue. (Tr. at 58.)

mental impairment. *See Wates v. Barnhart,* 274 F.Supp.2d 1024, 1039 n. 8 (E.D.Wis.2003) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00). However, plaintiff testified that she rarely used public transportation; rather, her son usually drove her to appointments. (Tr. at 49–50.) Again, plaintiff's son corroborated her testimony. (Tr. at 57–58.)

● **Plaintiff lives on her own.** It is true that plaintiff lives by herself, but the evidence showed that she got by only with the assistance of her son and her landlord, who shopped for her (Tr. at 48), paid her bills (Tr. at 53, 58), bought her food, and helped out around the house (Tr. at 57). This sort of assisted living arrangement is not inconsistent with disability. *See, e.g., McLevish v. Barnhart,* No. 01–1444, 2002 U.S. Dist. LEXIS 23195, at *13 (D. Minn. June 18, 2002), *adopted,* 2002 WL 1802247, 2002 U.S. Dist. LEXIS 14635 (D.Minn. Aug. 5, 2002) (rejecting ALJ's credibility evaluation where, although plaintiff lived alone, he did very little of his own housework, and ALJ did not account for this qualification).

In sum, the activities the ALJ relied upon were insubstantial and did not support her credibility determination. *See Luna,* 2001 WL 987860, *4, 2001 U.S. Dist. LEXIS 13117, at *13–14 (stating that where "an ALJ only expresses the claimant's ability to perform day-to-day activities in support of his finding that the claimant is not credible, courts have been hesitant to find that substantial evidence supported the ALJ's decision," and citing *Eback v. Chater,* 94 F.3d 410, 413 (8th Cir.1996) (the ALJ committed reversible error by finding that claimant's activities

of taking care of personal needs, frequently driving to visit family members, attending bingo fairly consistently, taking part in the care of a 19-month old, sharing cooking and house cleaning responsibilities with her husband were inconsistent with her testimony that she is unable to work where no other evidence supported the ALJ's conclusion); *Jones v. Apfel,* 997 F.Supp. 1085, 1092 (N.D.Ind.1997) (the ALJ committed reversible error by finding that claimant was not disabled by depression based only on the claimant's ability to perform daily physical activities without conveying other analysis in his decision when medical evidence confirmed that the claimant had depression); *Scott v. Shalala,* 879 F.Supp. 109, 113 (D.D.C.1995) ("The Secretary should not penalize Plaintiff for attempting to sustain a minimal lifestyle, despite her physical impairments.")).

Nor did the ALJ offer any bridge from this evidence to her conclusion that plaintiff's complaints of depression, limited intelligence and disabling pain were incredible. The ALJ also neglected to evaluate the veracity of plaintiff's testimony in light of the other factors set forth in SSR 96–7p. *See Steele,* 290 F.3d at 941–42. Therefore, the ALJ's credibility determination cannot stand.[18] Further, to the extent that the ALJ relied upon that determination in rejecting plaintiff's claim of mental impairment and request for testing, her decision on that matter also cannot stand.

**b. Completion of the 11th Grade and Lack of Special Education**

 The ALJ's second reason for rejecting plaintiff's claim of mental impairment was that plaintiff had completed the

---

**18.** To the extent that the ALJ relied on plaintiff's "poor work history," she failed to properly consider whether this was due to lack of motivation or lack of ability. Plaintiff testified that she did not understand how to wrap the sandwiches at McDonald's and that she was asked not to return to one of her temporary assignments because she could not understand how to do it.

11th grade in school and indicated on various forms that she was not in special education classes. However, the Commissioner's regulations provide that formal education completed many years previously may not be meaningful in terms of ability to work, and that numerical grade levels may not represent actual educational abilities. If other evidence contradicts it, the Administration may not simply rely on numerical grade level. 20 C.F.R. § 416.964(b). In the present case, there was testimony that plaintiff was basically illiterate and dependent on others for basic functions. Further, there was evidence—ignored by the ALJ—that plaintiff performed quite poorly in school. Therefore, the ALJ's decision cannot stand on this basis.

### c. Lack of Psychiatric Treatment

■ The ALJ's third reason for rejecting plaintiff's claim was that plaintiff mentioned depression at just one doctor's visit and had never received psychiatric treatment. However, there was evidence in the record that plaintiff had received such treatment in the past, but that the records were unavailable. (Tr. at 54.) Further, in this Circuit, lack of mental health treatment does not automatically allow the ALJ to conclude that there is no mental impairment. *See Wilder v. Chater*, 64 F.3d 335, 336–37 (7th Cir.1995). This is particularly true when the claimant was seeking treatment for physical problems only:

> [T]here is no reason to expect a doctor asked about an eye problem, or a back pain, or an infection of the urinary tract to diagnose depression. He is not looking for it, and may not even be competent to diagnose it. Because depression

is a serious risk factor for suicide, doctors are constantly being urged to watch out for depression in their patients. The urging is needed because doctors who are not psychiatrists are not quick to diagnose a mental illness, such as depression, that is not manifested in wild behavior. This may be an especially serious problem in the black community.

*Id.* at 337 (internal citations omitted). Plaintiff is African–American. Further, there is evidence that one of plaintiff's treating physicians—Dr. Nwilati—did spot depression and advised his patient to seek psychiatric care. Finally, plaintiff's claim was not based solely on depression but also on limited intellectual functioning, which is not "treatable." As will be discussed, if plaintiff, her son and the VE's testimony is to be believed, she is unemployable due to those limitations.[19]

### d. DVR Report

Finally, the ALJ stated that when plaintiff worked with DVR no mental limitations were noted. However, the evidence from the DVR file is extremely limited. (Tr. at 358–60.) No restrictions—physical or mental—are listed on the form report completed on March 1, 2001 by a doctor with an illegible signature (probably Weidman, the orthopedist). The only impairment listed on the form is impingement syndrome of the left shoulder (Tr. at 358), yet the ALJ found the existence of various other severe, physical impairments nonetheless (Tr. at 21). The omission of mental/intellectual restrictions in this truncated report therefore cannot be considered significant.

For all of these reasons, the ALJ's rationale for rejecting plaintiff's claim of severe

---

19. As will also be discussed, the ALJ should have ordered a consultative exam to explore this impairment. "It is error for an ALJ to refuse to obtain a complete consultative examination and then to deny benefits because the record lacks the evidence such an examination could have produced." *Manning v. Sec'y of Health & Human Servs.*, 881 F.Supp. 201, 204 (W.D.Pa.1995).

mental impairment and request for consultative testing cannot withstand scrutiny. However, there are additional reasons to reverse.

### 2. The ALJ Ignored Important Evidence

"If there is one fundamental principle guiding judicial review of an ALJ decision in a Social Security case, it is that the ALJ may not ignore evidence inconsistent with h[er] opinion without explanation." *Martin v. Apfel*, 118 F.Supp.2d 9, 15 (D.D.C. 2000). In the present case, the ALJ either ignored or, more likely, the hearing office misplaced, materials submitted by plaintiff after the hearing but before the record closed. Further, while the ALJ mentioned Sylvester's testimony in the body of her decision, she provided no evaluation of its credibility.

 The high school transcript plaintiff submitted post-hearing provides support for plaintiff's contentions of limited intellectual functioning: she received mostly "D"s or "U"s in her classes and she appeared to take a class called "reading improvement." Sylvester's testimony supported her claim of depression and inability to function and relate to others "on a regular level." The ALJ's failure to consider this evidence was reversible error. *See, e.g., Huston v. Bowen*, 838 F.2d 1125, 1130 (10th Cir.1988) (reversing where ALJ failed to consider witness testimony supporting plaintiff's subjective allegations of pain); *Gorecki v. Massanari*, 197 F.Supp.2d 154, 159 (M.D.Pa.2001) ("[W]here the ALJ makes a credibility determination regarding the plaintiff, it is expected that the ALJ address the testimony of additional witnesses who are offered to bolster or corroborate the plaintiff's own testimony."); *Dunn v. Apfel*, No. 98–591–B, 1999 WL 1327399, *8, 1999 U.S. Dist. LEXIS 19768, at *27 (D.N.H. Dec.10, 1999) ("In the present case, because the

ALJ's decision failed to even mention—let alone evaluate—evidence that may have favored Dunn's claim of mental impairment, it is impossible to determine whether this evidence was implicitly discredited or instead was simply overlooked."). For this reason, as well, the matter must be reversed and remanded.

### 3. The VE Confirmed that Plaintiff's Alleged Mental Limitations Would Be a Significant Factor in her Ability to Work, and the Lack of a Psychological Evaluation Prevented an Informed Decision Regarding those Alleged Limitations

In some cases, a court might conclude that an ALJ's failure to properly consider certain evidence or order a psychological evaluation constitutes harmless error. *See, e.g., Keys v. Barnhart*, 347 F.3d 990, 994 (7th Cir.2003) (holding that harmless error doctrine applies in social security proceedings). And, as noted, courts should generally respect an ALJ's determination as to how much evidence is enough. In the present case, however, the ALJ's failure to properly consider plaintiff's mental impairment and order a consultative examination cannot be overlooked.

In her decision, the ALJ relied on the VE's testimony in response to her second hypothetical to support her step five finding. (Tr. at 20 [decision], 65 [VE testimony].) However, the VE testified that if the ALJ accepted plaintiff's testimony as to her limited intellectual abilities, the jobs he mentioned would be eliminated. (Tr. at 66–67.) Thus, acceptance of this testimony would make a difference. *See Sims v. Harris*, 631 F.2d 26, 28 (4th Cir.1980) (remanding where had I.Q. testing and psychological examination been done the ALJ's decision might have been different).

Therefore, the matter must be remanded for reconsideration.

On remand, the ALJ must obtain a psychological consultation with intelligence testing. Plaintiff's evidence, properly evaluated, was sufficient to show a "reasonable possibility" of a severe mental impairment. *See Hawkins*, 113 F.3d at 1167. Given the testimony of the VE, an informed decision cannot be made on this claim absent better evidence as to the nature and extent of the impairment and plaintiff's intellectual functioning. Evidence on plaintiff's mental impairment and intellectual functioning "is not contained in the records of [plaintiff's] medical sources," 20 C.F.R. § 416.919a(b)(1); evidence of plaintiff's past mental health treatment was no longer available due to the closure of the hospital where such treatment had been obtained (Tr. at 54), 20 C.F.R. § 416.919a(b)(2); and the absence of evidence on this critical issue results in a record insufficient to rule on the claim, § 416.919a(b)(4).

In *Chapman v. Barnhart*, 189 F.Supp.2d 795 (N.D.Ill.2002), the court concluded, on similar facts, that the ALJ erred in failing to obtain a psychological evaluation. In *Chapman*, the plaintiff applied for benefits based on a hand injury. *Id.* at 798. At the hearing, she testified that she had only a 6th grade education, could not read and had memory problems. A friend who accompanied the plaintiff to the hearing stated that the plaintiff was "kind of slow," could not read, and was unable to "understand." *Id.* at 803. The friend further stated that she did the plaintiff's paperwork for her and showed her "how to find places, phone numbers and all that." *Id.* When the ALJ advised that he was sending plaintiff for a consultative examination regarding her hand, the friend suggested that the plaintiff see a "psychiatry doctor" too. *Id.* at 804.

The ALJ refused to obtain a psychological evaluation, stating that there was no evidence of a mental problem. The court reversed the ALJ's decision, noting that the ALJ is not a mental health professional and could not make his own independent psychological determination. *Id.* at 804 n. 5 (citing *Rohan*, 98 F.3d 966). Further, the court found unpersuasive the fact that plaintiff's doctors, who were treating her for physical problems, did not mention any psychological problems. "These individuals were medical doctors, etc, not mental health professionals and directed their examinations and reports solely to physical issues. Thus, their reports, respectfully, would not operate to relieve the ALJ as to his duty herein, as discussed." *Id.* The court concluded:

> The record indicates that it is possible that Plaintiff had a mental impairment. The ALJ had a duty to fully develop the record to determine if Plaintiff did in fact suffer from such an impairment. Because the Commissioner has the burden of fully developing the record, the ALJ should have, at a minimum, ordered an appropriate consultative psychological examination of Plaintiff and developed the evidentiary record on this subject.

*Id.* at 805.

The same result must be reached in this case. Plaintiff and her witness testified as to her deficient mental acumen; she requested a psychological consultation; and there was some medical evidence supporting her contentions. *See also Sanchez*, 2000 WL 376616, *3, 2000 U.S.App. LEXIS 6769, at *9 (finding that doctor's "diagnosis of major depression triggered the ALJ's duty to further develop the record concerning that impairment"); *McCall v. Bowen*, 846 F.2d 1317, 1320 (11th Cir.1988) (finding that suggestions made by plaintiff's treating physicians that she might be

suffering from a psychological condition, coupled with plaintiff's testimony of mental problems, might be enough to require the appointment of a psychiatrist or psychologist); *Cannon v. Harris*, 651 F.2d 513, 519 (7th Cir.1981) (finding that even though plaintiff did not allege alcoholism as cause of disability in her application, evidence elicited during the hearing, although "insufficient itself to support finding of disability, was sufficient to raise an issue as to plaintiff's mental and psychological capacity to engage in substantial gainful activity," and remanding for further development of the record).

The present case is distinguishable from those where the Seventh Circuit affirmed the ALJ's refusal to order a consultative examination. Those cases typically stand in two camps: where the ALJ collected enough evidence to reasonably rule on the claim, *e.g., Griffith*, 138 F.3d at 1153 (affirming where the ALJ re-contacted the plaintiff's treating physicians, reviewed the psychological evaluation that had been arranged by the plaintiff's counsel, obtained the services of a psychologist to testify at the supplemental hearing, and provided plaintiff with the opportunity to present additional evidence regarding her mental impairments),[20] and where the plaintiff failed to present enough evidence to justify further inquiry, *e.g., Howell*, 950 F.2d at 348–49 (affirming where there was no objective evidence to support claim of disabling limitations and no medical evidence of depression); *see also Gill v. Shalala*, No. 94–C–2299, 1994 WL 649989, *2, 1994 U.S. Dist. LEXIS 16391, at *7–9 (N.D. Ill. Nov. 14, 1994) (affirming where none of the plaintiff's doctors ever suggested the existence of mental problems, an agency consultant did not diagnose a mental impairment after conducting a mental status

exam, and the ALJ found plaintiff's credibility "somewhat suspect"). In the present case, the ALJ made no effort to develop the record on this issue, there was some medical support in the records plaintiff presented, and the ALJ erred in evaluating the credibility of plaintiff and her son. Therefore, under the facts presented here, it was error for the ALJ to refuse to purchase a consultative examination.

### 4. The Commissioner's Arguments in Support of the ALJ's Decision are Unpersuasive

The Commissioner argues that plaintiff failed to come forward with sufficient evidence of a significantly limiting, medically determinable mental impairment. She notes that, although plaintiff was represented by counsel at the hearing, she did not present the results of any intellectual testing. For the reasons stated above, I conclude that plaintiff did produce evidence sufficient to create a "reasonable possibility" of mental impairment and trigger the ALJ's duty to develop the record. Further, the record supports plaintiff's argument in reply that, as an indigent (*See* R. 4), she could not afford to obtain intelligence testing on her own. In *Luna*, 2001 WL 987860, *5, 2001 U.S. Dist. LEXIS 13117, at *19–22, the court remanded where counsel could not obtain a report due to plaintiff's indigence, the ALJ failed to obtain a consultative exam to fill the gap, and the court concluded that a reasoned determination could not be made without additional evidence. The same result must be reached here.

Moreover, there is a clear difference between a claimant who argues that she should have been afforded a consultative examination, and one who argues that the

---

**20.** Likewise, in *Kendrick*, the court held that the plaintiff had "received plenty and to spare" when the ALJ had already obtained

five reports at public expense. 998 F.2d at 457–58.

ALJ failed to procure evidence already in existence. *Hawkins,* 113 F.3d at 1169. Where the evidence is in existence, it is proper to ask why the claimant did not secure it herself and to consider whether the claimant has shown prejudice due to its omission.

It would not be reasonable, however, to expect a claimant to demonstrate that evidence from a consultative examination, which has yet to be administered, would necessarily be dispositive. As stated earlier, the ALJ should order a consultative exam when evidence in the record establishes the reasonable possibility of the existence of a disability and the result of the consultative exam could reasonably be expected to be of material assistance in resolving the issue of disability.

*Id.*

The Commissioner next argues that the ALJ did not err by failing to address the high school transcript because there is no indication that it was before the ALJ at the time of her decision. The Commissioner is incorrect. The document contained in the record before this court bears the "received" stamp of the Milwaukee Office of Hearings and Appeals, with a date of March 12, 2003. (Tr. at 466.) Given the serious concerns that have been raised about the handling of documents and files at the Milwaukee OHA, *see, e.g., Uphill v. Barnhart,* 271 F.Supp.2d 1086, 1092 (E.D.Wis.2003) (citing Mary Zahn, *Office Mess Delays Aid for Disabled,* Mil. J. Sen., June 17, 2003, at A1) (noting a backlog of more than 1400 cases at the Milwaukee office of hearings and appeals, as well as "other telling signs of disarray," including boxes of unopened mail that was several months old), it appears likely that this evidence was misplaced. Because

plaintiff has shown that it was "before" the ALJ prior to her September 16, 2003 decision, the evidence should have been considered, and the cases cited by the Commissioner are inapposite. *See, e.g., Eads v. Sec'y of Health & Human Servs.,* 983 F.2d 815, 817 (7th Cir.1993) (stating that ALJ "cannot be faulted for having failed to weigh evidence never presented to him").

Finally, the Commissioner argues that the ALJ adequately explained her credibility determination. However, virtually all of the Commissioner's argument is focused on the ALJ's analysis of plaintiff's physical problems. As noted above, the ALJ's analysis of the credibility of plaintiff's testimony regarding her mental problems was essentially limited to a discussion of plaintiff's daily activities. And, as discussed, this was insufficient.[21]

## IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that the Commissioner's decision is **REVERSED,** and this matter is **REMANDED** for further proceedings consistent with this decision pursuant to § 405(g), sentence four. On remand, the ALJ shall obtain a psychological consultation with intelligence testing, re-evaluate plaintiff's alleged mental impairment and all of the evidence and testimony pertaining thereto, and consider plaintiff's arguments as to the reliability of the VE's testimony.

---

21. Because I conclude that the matter must be reversed and remanded based on the mental impairment and credibility issues I need

not consider plaintiff's argument regarding the VE's testimony. Plaintiff may renew that argument before the ALJ on remand.